Pages 1 - 48

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE PAUL S. GREWAL, MAGISTRATE JUDGE


| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | NO. 5:15-MJ-70142-MAG |
| | ) | |
| ARMIN HARCEVIC, | ) | |
| | ) | |
| Defendant. | ) | San Jose, California |
| _____ | ) | Tuesday, February 24, 2015 |

**TRANSCRIPT OF OFFICIAL ELECTRONIC SOUND RECORDING
OF PROCEEDINGS**

FTR 1:52 p.m. - 2:59 p.m. and
3:14 p.m. - 3:14 p.m.=  54 minutes

**APPEARANCES**:

For Plaintiff:          MELINDA L. HAAG, ESQ.
                        United States Attorney
                        150 Almaden Boulevard, Suite 900
                        San Jose, California  95113
                  BY:   **AMBER S. ROSEN**
                        **GARY FRY** (as indicated)
                        Assistant United States Attorneys


For Defendant:          STEVEN KALAR
                        Federal Public Defender
                        55 South Market Street, Suite 820
                        San Jose, California  95113
                  BY:   **GRAHAM ARCHER**
                        Assistant Federal Public Defender


Also Present:  Richard Sarlatte, Pretrial Services Officer

Transcribed by:         Leo T. Mankiewicz, Transcriber
                        leomank@gmail.com
                        (415) 722-7045

1    Tuesday, February 24, 2015

2                                                      1:52 p.m.

3                    P R O C E E D I N G S

4              (Defendant present in court.)

5         THE COURT:  Mr. Rivera, whenever you are ready, would

6    you please call the next case.

7         THE CLERK:  Calling United States versus Armin

8    Harcevic, case number 15-MJ-70142-MAG.  Matter on for

9    defendant's motion for reconsideration of bail.

10             Please state your appearances.

11        MS. ROSEN:  Good afternoon, your Honor.  Amber Rosen

12   for the United States.

13        THE COURT:  Ms. Rosen, good afternoon.

14        MR. ARCHER:  Good afternoon, your Honor.  Graham

15   Archer for Mr. Harcevic, who is present before the Court in

16   custody.

17        THE COURT:  Mr. Archer, good afternoon to you, sir.

18             Mr. Harcevic, good afternoon, sir.

19        THE DEFENDANT:  Good afternoon.  How are you?

20        THE COURT:  I'm well, thank you, sir.

21             Mr. Harcevic, you may recall that the last time we saw

22   each other, I had ordered you detained pending further

23   proceedings in this case.  I also, however, set a further

24   hearing for today to address whether certain conditions could

25   be set that would allow you to be released.

1          I'm going to give your attorney Mr. Archer a full

2    opportunity to address that issue, but because this is the

3    government's request, I'm going to start with the government

4    prosecutor before I turn to Mr. Archer.

5          Do you understand this, sir?

6          **THE DEFENDANT:**  Yes.

7          **THE COURT:**  All right.  Let's proceed.

8          Ms. Rosen, go ahead.

9          **MS. ROSEN:**  Thank you, your Honor.  We continue to

10   request detention in this case.  Despite the fact that the

11   defendant is willing to post a significant sum of money, we

12   believe that based on not only the seriousness of the crime,

13   which we discussed at the last detention hearing, and the

14   weight of the evidence, as there's already been a finding of

15   probable cause, the defendant has significant ties to foreign

16   countries, including Bosnia, Croatia where he's also traveled,

17   and Germany, where he lived for a number of years.

18          He has relatively weak ties to this area.  He has been

19   living here only since January.  He did live here previously,

20   but that was several years ago.  He has no stable employment

21   here.  His wife has no employment here.  His only relative

22   other than his immediate family of wife and children is his

23   sister, who's here.  He's living in a rental.  He owns no

24   property here.  He owns no property in the United States.

25          We believe that he came to San Jose at the time that

1    he did this past January, in part at least, because his

2    co-defendant was aware that he was under investigation in

3    St. Louis.

4           Most of his family is in Bosnia.  He does have some

5    family, but they're -- besides the ones I've mentioned, they're

6    in St. Louis, which is where this father and his wife's family

7    live.  He faces deportation if convicted.

8           We also have no information on the prior arrests from

9    2005 and 2014, so that just leaves an unknown as to the gravity

10   of any danger or even as to the flight risk.  We do know,

11   however, that he is a person of interest to the Department of

12   Defense and that he's on the Terrorist Watchlist.

13          In terms of the sureties, as I said, it is a

14   significant amount of money, and we do recognize that, but

15   there's two caveats to it, still.  Three of the four, and the

16   three that would be putting up the most money, are not family

17   members, they're friends.  They're people that he's known for

18   less than four years, it seems like, from the report here.  So

19   I don't know how significant their posting is; in other words,

20   if that would really prevent the defendant from fleeing.

21          In terms of, again, most of the money is in the form

22   of property.  We have not seen the property report, so we

23   haven't at this point been able to verify whether there is as

24   much equity as is claimed.

25          So based on this, we would ask for -- that he be sent

1    to St. Louis in detention.

2              **THE COURT:**  All right, thank you.

3              Mr. Archer.

4              **MR. ARCHER:**  Thank you, your Honor.  I'd like to

5    address a few things that were raised last time and also raised

6    in the criminal history report that are bothersome to me, and

7    the first is the government's allegation -- effectively,

8    unsupported allegation -- that he in some way, I guess, fled to

9    California, a place where he had worked before and lived

10   before, in order to avoid prosecution in this case.

11             I think it's important to note that this is an

12   unsupported speculation by an agent, that there's not any

13   record of any communications or anything like that suggesting,

14   you know, I'm going to go.

15             And this is a case where, in other detention hearings

16   in this very case, the Department of Justice has come and given

17   more discovery to Pretrial to suggest there's some harm that

18   was not, you know, was not presented or was not available when

19   they initially suggested release conditions.

20             And in fact, in Chicago, my understanding from the

21   federal defender in St. Louis is that Pretrial initially did

22   suggest release conditions, and then more discovery was given

23   to them, and they decided that that was not appropriate based

24   on that new discovery.

25             Of course, we're not here with any new discovery

1    because what Mr. Harcevic is accused of doing is alleged in

2    here and there's nothing additional.  It's a single transfer of

3    $1,500 as part of the conspiracy.  That's the only overt act,

4    and that's what he's accused of doing.

5         To the contrary, Mr. Harcevic has been -- while he's

6    been in St. Louis, it's been to be close to family.  It's been

7    verified by Pretrial that both his family and his wife's family

8    is there.  He was having trouble finding work there, and his

9    wife is available to testify today if the Court is concerned or

10   if there's any question as to the truth of what I'm about to

11   say, is that they were trying to find work here, and his

12   attempts to move back to California began well before even the

13   charged offense conduct, and in fact, you know, the overt act

14   here is alleged to be September 23rd of 2013.

15        And I would like, if the Court would accept -- if

16   I could mark that as Defense A, and what I'm handing up to the

17   Court right now, and provided to both Pretrial and to the

18   prosecution earlier today, this is an e-mail from

19   Mr. Harcevic's sister, who is present in court today, and the

20   reason that she sent me this e-mail with the attachments that

21   are attached there is to show -- and the attachments, in fact,

22   are a redacted copy of a housing application, and she's

23   forwarded on the e-mail showing when he was sending out housing

24   applications, and she's here to talk to the Court, if

25   necessary, about how she was acting basically as a proxy to

 1   help him find housing, and that that was an ongoing process,

 2   while he was attempting to find work.

 3       And I understand Pretrial's concern about lack of

 4   verifiable employment history.  He's been a handyman, he's

 5   doing contracting jobs, that sort of thing.

 6       So as for the flight risk, I just don't -- you know,

 7   I don't -- I don't see how else I can rebut speculation that he

 8   fled when the government already has provided a FISA notice in

 9   this case.  There's all sorts of electronic intercepts, I'd

10   have to assume there are GPS tracking, that sort of thing, and

11   that, you know, I've been told in other districts there are

12   10,000 pages of communications between co-defendants.

13       And so you'd think that somewhere in that they would

14   have intercepted some communication about Mr. Harcevic running,

15   and instead, we have speculation from an agent that he moved

16   out here.

17       Again, that's even -- that's addressing even the

18   liability and the validity of the suggestion, but the common

19   sense of it just doesn't add up.  There's no reason to travel

20   from Missouri back to San Jose to flee prosecution.  I mean, if

21   he were going to flee prosecution, if he had some suspicion

22   that he was going to be standing here, you know, and wanted to

23   run and did not want to face the charges, according to the

24   government, he has the means to flee the country.  And so

25   I don't think there's any weight to be given to that

1    speculation on the government's behalf.

2         Second, as to the issue of flight risk -- and this,

3    I think, connects a little bit with the raised concerns about

4    danger, as well -- is that, you know, the government's

5    suggestion that he has ties outside of the country.  I mean, he

6    fled a genocide to come to the United States, which is why he's

7    an LPR here.  He's here -- he travels to see his mother.  He

8    hasn't traveled back to Bosnia since 2009, since the birth of

9    his first child.

10        Now, he has an expired passport.  The government has

11   said, and Pretrial Services has verified as much as is

12   possible, that he's on a Terrorist Watchlist, that he's on

13   no-fly lists, that he's being -- you know, that they have grave

14   concerns about his arrest in 2005 and 2014 that they don't have

15   information about.

16        I submit to the Court, I have no idea how he would

17   successfully flee, especially given the conditions that are

18   suggested by Pretrial Services, electronic monitoring.  I mean,

19   we have him -- and this takes me, honestly, into the issue of

20   danger to the community, which is something that I'm a little

21   bit incensed about how this case is being treated.

22        It's basically being treated as the inverse of every

23   other case that we deal with here.  And I recognize why.  I'm

24   not standing before the Court saying that there aren't concerns

25   about the nature of the charges.  Of course that's something to

1    consider, but if I were standing here in any other case with

2    significant penalties, with absolutely pristine sureties --

3    I mean, no criminal history, significant equity, a wife with no

4    criminal history, he has one arrest for -- he has one, in my

5    view, valid arrest for unlicensed contracting, to which he pled

6    to a misdemeanor and three years of probation, no failures to

7    appear, and successful completion of misdemeanor probation in

8    California -- that he's now being treated as though he is sort

9    of irredeemably a danger to the community and a flight risk.

10          And Pretrial states that they have concerns about the

11    lack of information, and what we're going off here are 2005,

12    2014 arrests, and they've sought but were unable to receive

13    information from the Terrorist Screening Center as to the 2005

14    arrest.  They sought and were unable to receive information

15    from the National Ground Intelligence Center from the

16    Department of Defense, who apparently were responsible for

17    arresting my client in 2005 and 2014.

18          Am I to be left at a detention hearing with the

19    responsibility of proving a negative, because apparently,

20    there's information out there that is not being relayed, the

21    prosecution doesn't have, the FBI doesn't have -- at least

22    that's the position at detention -- any information about those

23    arrests?

24          How we can sit here and suggest that because someone

25    has effectively been arrested by the secret police -- I think

1    that's the appropriate term to use for this, and I apologize if

2    the Court considers that hyperbole, but how I can stand here in

3    court and defend my client when there are accusations that he's

4    the target of something in 2005, 10 years ago, and 2014,

5    recently, where he was arrested and released, and not be able

6    to rebut those because the secret police won't tell us why they

7    arrested him?  How that could possibly provide evidence of a

8    danger to the community based on that?

9            The record before the Court is clear.  He's not a

10   danger to the community.  He's a loving father.  His wife is

11   here.  The courtroom is full of his supporters.  The people

12   that have known him, as the government says, some of them for

13   three years, some of them for much longer, but the folks that

14   have known him for three years I've spoken with, and they're

15   happy to speak with the Court.  They've known him for three

16   years.  They've been with him five days a week.  They go to

17   mosque, they meet afterwards.  Their knowledge of him is

18   intimate.

19           To suggest that people would be coming in willing to

20   put up a million dollars in bond lightly, because they may not

21   have gotten to know him sufficiently, or the converse of that,

22   that he wouldn't take his relationship with those people

23   seriously because they've known him for three years, it blows

24   my mind.  I mean, it just doesn't -- it doesn't make sense to

25   me.

1           And so, your Honor, I would agree with Pretrial's

2    recommendation, shy of the amount of the bond.  I think a

3    million dollars here is exorbitant.  I think that a half a

4    million dollar bond would be appropriate in this case.  There

5    have been a number of people released on similar or lower bonds

6    around the country, in very similar cases.

7           And I just -- I think I've expressed my frustration to

8    the Court about the allegations here, and I think, especially

9    based on my conversations with counsel in other regions on this

10   case, that when there has been information -- I mean, we're

11   sitting here with, effectively, you know, the Department of

12   Defense and full FISA reviews and secret wiretaps,

13   international wiretaps.  If there were any information that

14   showed that Mr. Harcevic was a flight risk or a danger to the

15   community, beyond speculation in the face of a grand jury

16   indictment, it would be before this Court.

17          And so I would ask the Court to make the decision

18   based on the record here, not based on any sort of suggestion

19   that we should all be here and be afraid of Mr. Harcevic simply

20   because of the nature of the charges.

21          **THE COURT:**  Mr. Archer, let me ask, if I could, a

22   question or two about some of these issues.

23          My first question has to do with the timing

24   surrounding Mr. Harcevic's return to California, as you

25   describe it.  I have your tender, I take it from your

1    comments -- so does Ms. Rosen -- I take it that if I looked

2    through this, I will see that Mr. Harcevic was here or

3    elsewhere looking for housing here well before the indictments

4    were returned.  Is that what you're telling me?

5           **MR. ARCHER:**  And in fact, additionally what his wife

6    is here and can confirm, and Mr. Harcevic, as well, is that he

7    had been traveling out here to work.  He had been traveling out

8    here, staying with friends, and trying to find work out here.

9           The -- as his sister indicates, as well, she had

10   submitted some applications, and there were -- you know,

11   basically, he was unable to find housing at points in time

12   because he did not have sufficient income for, you know, the

13   applications in the Bay Area housing.

14          But he'd been traveling out here working, back and

15   forth, and the decision was finally made, from my conversations

16   with my client, is that he had some very promising long-term

17   employment -- in fact, some that he was supposed to start when

18   he was arrested -- and that was why the decision was made to

19   come out here permanently.

20          So yes, he's been -- what I'm telling the Court is

21   that he's been looking for the opportunity to move back to San

22   Jose since, really, very shortly after they moved to St. Louis,

23   and he had difficulty finding employment there, and that can be

24   verified by his wife.

25          And what I'm showing the Court now is not the first,

1   but one of the earlier attempts to find employment, and his

2   sister can verify later attempts to find employment, and it was

3   a continuous process, but it also involved him traveling out

4   here and back in order to do work, and this was intended to be

5   a permanent move out here that started in January, because he

6   had very promising work, which has obviously now been derailed.

7          **THE COURT:**  My next question for you, Mr. Archer, has

8   to do with the criminal record that's been presented in the

9   Pretrial Services report.  Perhaps I had misunderstood earlier

10  references to 2005.

11         Am I correct in now understanding that there were

12  actually two issues or two incidents in 2005 alleged or

13  suggested, one, a prosecution for a misdemeanor that we've

14  talked about, the working without a license, the contracting

15  issue, that's separate and apart from a second 2005 incident

16  alleged, as identified by the Terrorist Screening Center?

17         **MR. ARCHER:**  That is correct, your Honor.

18         **THE COURT:**  Okay.

19         **MR. ARCHER:**  That's my -- I mean, I don't mean to be

20  glib at all, but that's my understanding based on what's in the

21  report, with nobody -- with everyone refusing -- some other

22  people, at the other end, refusing to provide any information

23  about it.  So that is also my reading of this report, your

24  Honor.  I obviously can't confirm that, and it doesn't appear

25  that either Pretrial Services or the prosecution or the FBI can

1    confirm that.

2         **THE COURT:**  All right, and then separate and apart

3    from the two incidents in 2005, we have identified for us in

4    this report a 2014 matter, as identified by the National Ground

5    Intelligence Center of the DOD.

6                      (Pause in proceedings.)

7         **MR. ARCHER:**  Sorry, your Honor.

8         **THE COURT:**  No, that's fine.  I was simply asking

9    about what is alleged to be some type of report or incident

10   from 2014 from the Department of Defense.  Is that correct?

11        **MR. ARCHER:**  That is correct, yes.

12        **THE COURT:**  Okay.  All right --

13        **MR. ARCHER:**  And your Honor, I've had a conversation

14   in private with my client about the 2014 detention.  It's not

15   something that -- it's nothing that raises any indication that

16   it would be -- first of all, there's no case that came out of

17   that.  I spoke with his -- he had an attorney that represented

18   him on a traffic citation, and we ran -- I also brought, but

19   I don't think it's relevant because it's -- I can just tell the

20   Court, I spoke with that attorney today, and he said, "No,

21   I represented him on a traffic matter."  You know, he

22   instructed me on how to search any cases around that time in

23   the St. Louis system, and Missouri has a good, you know, court

24   case system, which did, in fact, return the two traffic matters

25   that Mr. Harcevic was represented on, and there's nothing else.

1          I mean, I'm sort of left at this, how can I prove a

2     negative, right?  I mean, if my client is -- didn't do anything

3     but is contacted by people that suspect him of something or are

4     harassing him about something, frankly, then what am I -- you

5     know, what am I to do other than prove that there's no

6     information about him?

7          THE COURT:  All right.  Now, in terms of where

8     Mr. Harcevic is living now, could you please just elaborate on

9     what I'm told in this report?  As I understand it, he lives

10    with his wife, he lives with his three children, correct?

11         MR. ARCHER:  Correct.

12         THE COURT:  They all live here in San Jose?

13         MR. ARCHER:  Absolutely.

14         THE COURT:  And this is at the Lynnhaven Drive

15    address, is that correct?

16         MR. ARCHER:  Yes, your Honor, that's my understanding.

17         THE COURT:  Okay, and can you shed any light on

18    exactly how long they've lived at that residence?  As

19    I understand it, they were working for some time to find a

20    place to live.  So am I right in understanding that they've

21    been there for a month or two or three, or...?

22         MR. ARCHER:  That is my understanding, your Honor.

23         MS. ROSEN:  Since January, I believe.

24         THE COURT:  Since January, okay.

25         MR. ARCHER:  Correct.

1    **THE COURT:**  Give or take.  I recognize we're all

2    operating with limited information, here.

3        One further question I have for you, Mr. Archer,

4    before I turn to Ms. Rosen, in terms of the work, if any, that

5    Mr. Harcevic has been able to secure prior to his arrest, has

6    he been able to find any work at all?

7        **MR. ARCHER:**  He has, your Honor, and I mean, my client

8    can describe for the Court directly, I'm comfortable with that.

9    He has several construction projects that he -- one of which

10   was supposed to -- and Armin, speak up if I'm getting anything

11   wrong -- was supposed to start -- it was a significant remodel

12   that he was going to be taking over that was to start on the

13   Monday after, that he was arrested, is that...?

14       **THE DEFENDANT:**  Actually, that, I had a meeting with

15   that client on a Friday 3:00 o'clock, and I was arrested at,

16   like, 1:00, something like that.  So he promised me, kind of,

17   that I'm going to take over a project in Saratoga Hills, and

18   I have another partner which told me we going to go together on

19   it because it's a huge project.  It's like, 4,000, 5,000 square

20   foot house.  And the partner, my partner is Nautica

21   Construction.  Antonio Bencun, he's the owner, and he told me

22   we're going to go together.

23       So on that promise and another promise in Cupertino,

24   another customer told me he wants to do an addition, that's why

25   I moved out here.  I said to my wife, you know, this is going

1    to take too long to be without you guys, you know, now looks

2    really promising, and if I find a place, I think we should just

3    go for it, you know, just this kind of.  And this was really

4    promising, Saratoga Hills and the Cupertino project.

5           **THE COURT:**  I understand.  Thank you, Mr. Harcevic.

6           All right, let me, if I could -- Mr. Archer, I'll give

7    you an opportunity to weigh in with any further information.

8    I'd like to return to Ms. Rosen, if I could.

9           Ms. Rosen, may I just ask about the 2005 -- the second

10   2005 incident as well as the 2014 incident.  I'm going to

11   confess, I don't even really know what a Terrorist Screening

12   Center is.  Could you perhaps shed some slight on that subject

13   for me?  Who are these folks and what do they do?  If you know.

14          **MS. ROSEN:**  I don't, I'm afraid.

15          **THE COURT:**  Okay.  Okay.  As I understand it,

16   Mr. Harcevic has been on a no-fly list or on a -- is that

17   correct?

18          **MS. ROSEN:**  I don't -- I don't know.  I mean, we

19   didn't tell him that.  I know he's on -- I mean, according to

20   this, he's, you know, been identified as a person of interest.

21   I know that he's on a Terrorist Watchlist.  Whether that

22   necessarily means a no-fly list, I actually -- I don't know.

23          **THE COURT:**  Nor do I, and that's why I ask.

24   I appreciate that.

25          **MR. ARCHER:**  Your Honor, I may have overstated the

1   no-fly portion.  I sort of, in my mind, I equate that with

2   significant harassment at the airport, and my understanding

3   from speaking with my client is that his -- he's basically

4   detained for an extraordinary amount of time every time that he

5   is in the airport.  He has been able to fly out to work here,

6   and --

7          **THE COURT:**  Well, that was why I was curious,

8   because --

9          **MR. ARCHER:**  Yeah, and I apologize if that -- yeah.

10          **THE COURT:**  -- I assumed Mr. Harcevic was going to

11   drive.

12          **MR. ARCHER:**  No, from St. Louis, no.

13          **THE COURT:**  He flew here.  Okay.

14          **MR. ARCHER:**  But that he's -- and frankly, is avoiding

15   all air travel as much as possible because of the embarrassment

16   of being pulled out of line and detained for significant

17   periods of time every time he's at the airport.

18          **THE COURT:**  And just so that I'm clear on the time

19   line here, when was the last time Mr. Harcevic traveled outside

20   the United States, as far as you know, Mr. Archer?

21          **MR. ARCHER:**  2009 was the last time he traveled, and

22   that was --

23          **THE COURT:**  And that was to visit his mother in

24   Bosnia.

25          **MR. ARCHER:**  Correct, and that was just before the

1  birth of your first child?

2  **THE DEFENDANT:**  My wife was pregnant at that time.

3  **MR. ARCHER:**  Okay.

4  **THE COURT:**  Oh, all right.

5  Ms. Rosen, I don't know if you have any further

6  information to share.

7  **MS. ROSEN:**  No, just the information that I received

8  was that the Terrorist Screening Center is -- we're not even

9  sure which agency it's with, whether it's DOD or DOJ but, you

10  know, it's analysts who basically are analyzing information

11  that comes to their attention.  So I really don't have much to

12  add on that.

13  In terms of -- the only thing I wanted to add, your

14  Honor, I think, you know, we've made our case in terms of the

15  flight risk that we think the defendant poses and the reasons

16  for that.  I know that the defendant claims that he came out

17  here for work and, you know, that may be true.  I will say that

18  our information is that his wife had had a job for 10 years in

19  St. Louis which she left in order for them to come out here,

20  and she's now unemployed out here.  So for what that's worth,

21  I just wanted to add that.

22  **THE COURT:**  All right, I appreciate that.

23  Mr. Archer, any further information you'd like to

24  provide, sir?

25  **MR. ARCHER:**  May I have a moment, your Honor?

1        **THE COURT:**  You may.

2                        (Pause in proceedings.)

3        **MR. ARCHER:**  Your Honor, just that my attorney proffer

4    on behalf of Mr. Harcevic is that he doesn't have any

5    independent recollection of the separate arrest in 2005, and so

6    I think my point is made, that we have no records of that.  I'm

7    not sure, you know, how it came up, but beyond that, I don't,

8    your Honor.  Thank you.

9        **THE COURT:**  All right.  Let me finally ask

10   Mr. Sarlatte, sir, is there anything you wish to add to the

11   reports?

12       **PRETRIAL SERVICES OFFICER:**  No, only that the 2005 and

13   2014 arrests or contact with law enforcement are listed in the

14   record check.  So that's simply what -- they were there --

15       **THE COURT:**  That's where they came from.

16       **PRETRIAL SERVICES OFFICER:**  We don't have more

17   information than that.

18       **THE COURT:**  All right, I appreciate your clarifying

19   that.  All right.

20       Well, as you all know, Pretrial Services has

21   recommended Mr. Harcevic be released, on a set of very

22   stringent conditions.  On balance, I am satisfied that I can

23   set release conditions that will allow Mr. Harcevic to be

24   released.  Let me review them all with you --

25       **MS. ROSEN:**  Your Honor, I -- just for the record,

1    I would say Pretrial Services' recommendation is actually for

2    detention, I believe, and that they just said if he were to be

3    released, that they would ask for those conditions.  That was

4    my understanding.

5           **MR. ARCHER:**  That was the original --

6           **PRETRIAL SERVICES OFFICER:**  The addendum does read,

7    your Honor, that because we don't have information, it's kind

8    of irresponsible to tell the Court that you can mitigate these

9    dangers not knowing these two arrests and their dispositions.

10          **MR. ARCHER:**  If I could ask further clarification --

11          **THE COURT:**  I appreciate that.

12          **MR. ARCHER:**  I apologize, your Honor, but if I could

13   ask for clarification from Pretrial, the concern about the lack

14   of information is specific to 2005 and 2014 contacts that come

15   up.  I don't think there's anything else that Pretrial's been

16   unsatisfied about in terms of verifying community support or

17   any of the sureties.  I think it's solely as to a question as

18   to completely unverified --

19          **THE COURT:**  Well, I'll certainly let Mr. Sarlatte

20   speak on behalf of Pretrial.  My understanding is that the

21   issue was about the 2005 and 2014 records, and you're simply

22   reporting what you're told.

23          **PRETRIAL SERVICES OFFICER:**  That is correct.

24          **THE COURT:**  Yeah, all right.

25          **MS. ROSEN:**  I was just looking at where they say, "We

1    respectfully recommend that the defendant be detained," which

2    is on the Recommendations section, at the top.

3         **THE COURT:**  Okay.  Well, I take --

4         **MS. ROSEN:**  And I understand that they also went on to

5    say that if he were going to be released --

6         **THE COURT:**  Correct.

7         **MS. ROSEN:**  -- then they recommend certain conditions.

8         **PRETRIAL SERVICES OFFICER:**  It's not possible for us

9    to assess his potential danger without knowing what's occurred

10   in his two contacts with law enforcement.

11        **THE COURT:**  I take your point.  I think Ms. Rosen is

12   accurately capturing the full recommendation provided by

13   Pretrial Services.  So I certainly don't quibble with that.

14        However, I am left with the responsibility of making a

15   decision based on these facts, and I am satisfied that

16   conditions can be set.  So I would like to review those, and

17   I want to be clear about this.

18        Mr. Archer, there have been four sureties identified,

19   potential sureties identified and proposed in the supplemental

20   report.  Are those individuals all here?

21        **MR. ARCHER:**  Yes, your Honor, I believe they are.

22        **THE COURT:**  Could you please invite them forward?

23        **MR. ARCHER:**  Sure.  So Majed, would you come up?

24   Mehyeddine as well, and Mounzer.

25        **THE COURT:**  Good afternoon.  Please step forward, if

1    you would.   I'm going to need each of you to step over here to

2    the podium where Mr. Archer is standing.   Please.

3           Would you each of you please tell me your names?   I'll

4    begin with you, ma'am.

5           **MRS. HACEVIC:**  Sanela Harcevic.

6           **THE COURT:**  And you, sir?

7           **MR. MEHYEDDINE ALAYLEH:**  Mehyeddine Alayleh.

8           **THE COURT:**  Sir?

9           **MR. MAJED ALAYLEH:**  Majed Alayleh.

10          **THE COURT:**  Sir?

11          **MR. LADKANI:**  Mounzer Ladkani.

12          **THE COURT:**  Welcome to each of you.

13          I called you forward because I have been told by

14   Mr. Harcevic's attorney Mr. Archer that each of you is willing

15   to serve as a surety, and that you, ma'am, are willing to serve

16   as a custodian as part of an order of release that I might

17   issue in this case, and I appreciate your conveying that

18   information, but I want to be very clear with you and speak to

19   you directly about what this responsibility entails, because

20   sometimes, when I explain these responsibilities to people in

21   your situation, they have second thoughts or they have doubts

22   about whether they wish to move forward, and if that's the case

23   here today, I won't hold that against any one of you.   It's

24   very important to me that you appreciate how serious this

25   responsibility is that you're about to take on.

1              As a surety, you are pledging your financial resources

2      to this Court in order to assure this Court that Mr. Harcevic

3      here is going to follow every one of the conditions I set, and

4      what that means is that if Mr. Harcevic were to violate even

5      one of the conditions of release, the government could take

6      that property, whether it's real estate or cash, and you would

7      never see it again.

8              Do you understand this?

9          **UNIDENTIFIED SPEAKER:**  Yes.

10         **MRS. HACEVIC:**  Yes.

11         **THE COURT:**  And is this something you wish to do?

12         **MRS. HACEVIC:**  Yes.

13         **UNIDENTIFIED SPEAKER:**  Yes.

14         **THE COURT:**  Knowing that if the defendant violates

15     even one of my conditions of release, that property could be

16     lost.

17         **UNIDENTIFIED SPEAKER:**  Yes.

18         **MRS. HACEVIC:**  Yes.

19         **THE COURT:**  All right.  Ma'am, I want to speak to

20     you --

21         **MRS. HACEVIC:**  Yes.

22         **THE COURT:**  -- in particular, because you've been

23     identified as a custodian, or as a potential custodian, which

24     means a couple of things that I want to be very clear about

25     with you.

1          Number one, as someone who is married to the defendant

2     and who lives at the same residence, you would have to provide

3     him with a place to live during his period of release.   But

4     there's another very important responsibility that a custodian

5     takes on above and beyond what any surety agrees to do, and

6     that is, if you are to become aware that Mr. Harcevic here were

7     in violation of even one of the conditions I'm setting, you

8     would have a responsibility to inform this Court, without any

9     delay, and if you were --

10          **MRS. HACEVIC:**  Yes.

11          **THE COURT:**  -- to fail to do that and the government

12     could show that you knew about something and you didn't report

13     it, well, then, you could face prosecution, as well.

14          Do you understand this?

15          **MRS. HACEVIC:**  Yes.

16          **THE COURT:**  Okay.  All right, well, if you wouldn't

17     mind, I'd like each of you to just step back.  I need to speak

18     to Mr. Archer, but you'll need to stay close by, so that I can

19     have you sign some papers.  Thank you.

20          Mr. Archer, I'd like to speak to you....

21          You may step next to your attorney, sir.  I want to

22     speak directly to you, because it's clear to me you have strong

23     support in this community, and from your family and friends,

24     and that's admirable, Mr. Harcevic, but it's very important

25     that you understand that you are primarily responsible for

1    following every one of these conditions, and that even though

2    others in this community and in your own family have stepped

3    forward to support you, this is your responsibility,

4    ultimately.

5            Do you understand this, sir?

6            **THE DEFENDANT:**  I understand that.

7        **THE COURT:**  Okay, and you also need to understand,

8    Mr. Harcevic, that if I were to learn that you were to violate

9    even one of these conditions of release that I'm about to set,

10   I would not hesitate to bring you back in here and put you back

11   into custody, and authorize the government to come after each

12   and every one of these individuals for the full amount of the

13   property they're posting.

14           Do you understand that?

15           **THE DEFENDANT:**  Yes, sir.

16       **THE COURT:**  Okay.  Let me review these conditions with

17   all of you.

18           As a condition of release, I am going to set a

19   $1 million bond that is to be secured by each of the four

20   proposed sureties and/or custodians who have pledged property

21   and cash.  I'm going to apologize in advance if I mispronounce

22   anyone's name.

23           Mrs. Harcevic, I understand that you are willing to

24   post your home at 44120 Upton Court, is that correct?

25           **MRS. HACEVIC:**  Yes.

1          **THE COURT:**  All right.  Mr. Alayleh -- Alayleh?  Am

2     I pronouncing that correctly, sir?  My understanding is that

3     you are willing to post cash and your home at 3770 Caravella

4     Drive, is that right, sir?

5                      (Response inaudible.)

6          **THE COURT:**  All right.  Mr. Alayleh, my understanding

7     is that you're willing to post a cash bond in the amount of

8     $100,000, is that right, sir?

9                      (Response inaudible.)

10         **THE COURT:**  Okay, and Mr. Ladkani, I also understand

11    that you are willing to post your property at 1166 Reeve

12    Street, is that right, sir?

13                     (Response inaudible.)

14         **THE COURT:**  All right.  In addition to that bond, I am

15    going to require, Mr. Harcevic, that you not travel outside of

16    the Northern District of California where we currently sit and

17    stand, as well as the Eastern District of Missouri.

18              Now, what you'll come to learn in just a few minutes,

19    sir, is that you're not going to be leaving your home at all.

20    I'm going to authorize that you be subject to electronic

21    monitoring and that you only leave your house for certain

22    purposes, but under no circumstances should you be in any other

23    place other than this District and Eastern Missouri.

24              Do you understand what I'm saying, sir?

25         **THE DEFENDANT:**  I do.

1      **THE COURT:**  Okay.  I'm also going to require that you,

2      immediately upon your release, report to our Pretrial Services

3      office here in the San Jose courthouse.  Mr. Sarlatte and his

4      organization will supervise your release while you are awaiting

5      trial in this case.

6           You are to surrender any passports and visas you may

7      have to Pretrial Services.

8           Let me ask Mr. Archer this question before I do

9      anything else.  Mr. Archer, my understanding from your earlier

10     comments is that Mr. Harcevic had a passport, but it is no

11     longer valid.  Is that correct?

12     **MR. ARCHER:**  Correct, I think -- and Sanela, you can

13     clarify this.  The physical passport, I think --

14     **MRS. HACEVIC:**  It's home.

15     **MR. ARCHER:**  -- is still in his wife's custody at

16     home, but it's not current.

17           Okay, you can speak up.

18     **MRS. HACEVIC:**  Yes, that is.

19     **THE COURT:**  All right, well, as a condition of

20     release, I want that expired passport surrendered to Pretrial

21     Services.

22           And Mr. Harcevic, you should understand that while

23     you're on release, you're not to apply for any new passports,

24     visas, any kind of travel documents, from any government.

25           Do you understand that, sir?

1          **THE DEFENDANT:**  I do.

2          **THE COURT:**  All right.  While you're on release, I'm

3     going to require that you not possess any firearm, destructive

4     devices or any kind of dangerous weapon.

5          **THE DEFENDANT:**  Um-hum.

6          **THE COURT:**  You're going to be required while on

7     release to remain in the custody of your wife, Mrs. Harcevic,

8     at the 2011 Lynnhaven Drive address.  Do you understand that,

9     sir?

10                    (Response inaudible.)

11         **THE COURT:**  What that means is that's where you're

12    going to live, and to that end, you are not to move from that

13    residence unless you have permission from your Pretrial

14    Services officer in advance.

15         Do you understand what I'm saying?

16         **THE DEFENDANT:**  Yes, I do.

17         **THE COURT:**  Okay.  All right, while on release, you

18    are not to contact any of your co-defendants in this case

19    unless you have an attorney, your attorney, present with you --

20         **THE DEFENDANT:**  Um-hum.

21         **THE COURT:**  -- during that contact.  I've already

22    explained you're not to move from your residence without prior

23    approval.  So if for some reason, sir, things happen in life,

24    if you lose your lease or for some other strange reason you

25    need to be out of that house or home, before you do that, you

1   need the prior approval of your Pretrial Services officer.

2          Am I crystal clear about that?

3          **THE DEFENDANT:**  Yes.

4          **THE COURT:**  Okay.  As I mentioned, I am going to be

5   requiring -- I am requiring that you be subject to what's

6   called electronic monitoring, and you're going to be staying at

7   home, sir.  I'm going to allow you to leave home for very

8   limited purposes.  You may leave home to go to court, you may

9   leave home to meet with your attorney Mr. Archer, you may leave

10  home to attend any medical appointments and/or emergencies, but

11  all of these things need to be approved by Pretrial Services.

12         Do you understand what I'm saying?

13         **THE DEFENDANT:**  Yes, I understand.

14         **THE COURT:**  Okay.

15         **MR. ARCHER:**  Your Honor, as to that, if he secures

16  employment and it's verified by Pretrial, I would ask that that

17  condition be added, as well.

18         **THE COURT:**  If he secures employment, Mr. Archer,

19  I will entertain a request, but we're going to get back

20  together and I want to evaluate that.  So I will consider that

21  request, but -- I certainly will consider it, if it becomes an

22  issue.

23         All right, Mr. Harcevic, you are also going to be

24  required to comply with three other conditions I want to review

25  with you.

1          The first is that while you're on release, you are to

2     appear at any proceeding ordered by the Court in this case, and

3     surrender for any sentence that may be imposed by the Court in

4     this case.

5          While on release, you are not to commit any federal,

6     state or local crime, and while on release, you're not to

7     harass, threaten, intimidate, injure, tamper with or retaliate

8     against any witness, any informant, any victim, any juror or

9     any officer of this court.  You are not to obstruct the

10    criminal investigation of this matter in any way.

11         Do you understand this, sir?

12         **THE DEFENDANT:**  Yes, I do.

13         **THE COURT:**  All right.  Bear with me, I need to take

14    some further information in order to complete this.  This may

15    just take minute or two.

16         Mr. Rivera, it's still the 24th, am I right, sir?

17         **THE CLERK:**  Yes, your Honor.

18         **MR. ARCHER:**  Your Honor, I did forget to mention, for

19    religious services, could that be added to the...

20         **THE COURT:**  In light of the allegations of this case,

21    I am not going to permit that, no.

22                         (Pause in proceedings.)

23         Mr. Harcevic, may I ask you, sir, with your attorney's

24    permission, do you have a telephone at the Lynnhaven address?

25    Do you have a mobile number?

1        **THE DEFENDANT:**  My mobile was taken by the federal --

2   by the FBI.

3        **THE COURT:**  Okay.

4        **THE DEFENDANT:**  So I don't have any phone.

5        **THE COURT:**  Let me ask your wife.

6        Ma'am, do you have a phone?

7        **MRS. HACEVIC:**  Yes, I do.

8        **THE COURT:**  What is your phone number, ma'am?

9        **MRS. HACEVIC:**  (408) 464-8877.

10       **THE COURT:**  Thank you.

11                (Pause in proceedings.)

12       May I ask Mr. Majed Alayleh, sir, where do you live?

13   What's your address?

14       **MR. MAJED ALAYLEH:**  I live on 3777 Caravella,

15   C-A-R-A-V-E-L-L-A, Drive, in San Jose, 95117.

16       **THE COURT:**  What is your phone number, sir?

17       **MR. MAJED ALAYLEH:**  (408) 5 -- actually, I give you my

18   home phone number?

19       **THE COURT:**  Yes.

20       **MR. MAJED ALAYLEH:**  (408) 243-8587.

21       **THE COURT:**  Thank you, sir.  You may step back.

22       Mr. Alayleh?

23       **MR. MAJED ALAYLEH:**  Shall I also give you my cell

24   phone?

25       **THE COURT:**  I only need the one number, sir.  Thank

1   you.

2          Sir, may I ask you, where do you live?

3          **MR. MEHYEDDINE ALAYLEH:**  I live at 8554 Parkland

4   Avenue, P-A-R-K-L-A-N-D as in David, San Jose, California

5   95117.

6          **THE COURT:**  And what phone number do you use, sir?

7          **MR. MEHYEDDINE ALAYLEH:**  (408) 489-9273.

8          **THE COURT:**  Thank you, sir.

9          Mr. Ladkani, what is your address, sir?

10         **MR. LADKANI:**   1166 Reeve Street, Santa Clara, 95050.

11         **THE COURT:**  And sir, that zip code again is 95...?

12         **MR. LADKANI:**  ...050.

13         **THE COURT:**  Thank you.  What is your phone number,

14  sir?

15         **MR. LADKANI:**  (408) 386-5859.

16         **THE COURT:**  Thank you.  Thank you, sir.

17                     (Pause in proceedings.)

18         All right, Mr. Archer, if you would, sir, I'm going to

19  need to have you direct Mr. Harcevic as well as the sureties

20  and custodian to initial each condition and sign at the bottom.

21  There's not a lot of room on that form, so do the best you can,

22  using either the left-hand or right-hand sides for the marks

23  and the signature blocks at the bottom.

24         **MR. ARCHER:**  Sure, thank you, your Honor.

25                     (Pause in proceedings.)

1          **THE COURT:**  Thank you, Mr. Rivera.

2          All right, counsel, before I sign a release order, we

3     have a couple of other issues to address.  One is exactly when

4     Mr. Harcevic is scheduled to appear in the Eastern District of

5     Missouri.

6          Mr. Archer, do you have any information about his next

7     court appearance?

8          **MR. ARCHER:**  I don't, your Honor.

9          **THE COURT:**  All right.  And if I might, what I will --

10    unless you have any information, Ms. Rosen?

11         **MS. ROSEN:**  I do, your Honor, but I think there's a

12    number of issues before we get --

13         **THE COURT:**  We do.

14         **MS. ROSEN:**  -- to that.

15         **THE COURT:**  I'm just looking to fill out the form, but

16    I think I anticipate --

17         **MS. ROSEN:**  Oh, okay.

18         **THE COURT:**  -- where you're going with this.

19         **MS. ROSEN:**  Well, the date that I have currently,

20    assuming it would stay realistic, is March 10th at 9:00 a.m.

21    before Magistrate Judge David Noce, N-O-C-E, and that's at the

22    Federal Courthouse at 111 South 10th Street, 17th floor North,

23    in St. Louis, Missouri.

24         **THE COURT:**  Thank you.  Now, to address the issue

25    Ms. Rosen at least raises implicitly, which is several

1    intermediate steps that need to take place before that.  Let me

2    first raise the issue of the I.D. and removal hearing, which

3    has never been addressed by this Court.

4          **MS. ROSEN:**  Yes.

5          **THE COURT:**  At this point, Mr. Archer, is Mr. Harcevic

6    contesting that?  Does he wish to have a hearing?

7          **MR. ARCHER:**  No, your Honor.  We waive the removal and

8    the I.D.

9          **THE COURT:**  Okay.  All right, so let me have

10   Mr. Rivera, if I could, present a form to complete that.

11         While Mr. Archer is doing that, Ms. Rosen, do you wish

12   to raise any other intermediate events between now and when

13   Mr. Harcevic would appear in St. Louis?

14         **MS. ROSEN:**  Yes, your Honor.  We, of course, would

15   like to see the property packages before the property's

16   posted --

17         **THE COURT:**  Of course.

18         **MS. ROSEN:**  -- with the Court, and also just to let

19   you know that once that -- if that happens and the release

20   order gets signed, we are going to ask for a stay of the order,

21   because it's my understanding that Missouri would like to

22   appeal the release order.

23         **THE COURT:**  I understand.

24         Mr. Harcevic, let me allow your attorney to complete

25   this form first and then I'll explain to you what all is

1    happening here.

2                        (Pause in proceedings.)

3              **MR. ARCHER:**  Your Honor, I'm providing the Court's

4    clerk with an executed waiver of identity hearing.

5              **THE COURT:**  All right.  In light of your

6    representation and Mr. Harcevic's signature on this, I am

7    accepting that waiver.

8              Let me turn to the issue of what happens next.

9    Ms. Rosen, if I might just ask a question for clarification?

10             **MS. ROSEN:**  Sure.

11             **THE COURT:**  My understanding is that because this case

12   is pending in another district, to the extent the U.S.

13   Attorney's Office in that district wishes to appeal my order,

14   they will take that appeal or review before the district judge

15   in St. Louis, is that correct?

16             **MS. ROSEN:**  That's correct.

17             **THE COURT:**  Okay, and in light of that, I take it,

18   then, that Mr. Harcevic would need to be transported back to

19   St. Louis in order to appear at that hearing, or -- is that

20   fair?  I'm just trying to figure out where Mr. Harcevic will be

21   in this intervening period, as far as you know.  I'm not

22   holding you --

23             **MS. ROSEN:**  Well, my understanding is, I don't believe

24   that they would need Mr. Harcevic's appearance in order to do

25   the appeal.

1    **THE COURT:**  Okay.

2    **MS. ROSEN:**  Whether -- but they're not going -- they

3    can't take the appeal until, you know, the bond is actually

4    posted and the order is signed --

5    **THE COURT:**  Right.

6    **MS. ROSEN:**  -- and then we would ask for a stay, and

7    then at that point, they would do the appeal.  I don't know

8    that they need to actually have his body to do that.

9    **THE COURT:**  That's my understanding, but I will

10   confess, I have heard it described otherwise, and so I wanted

11   to see if I could --

12   **MS. ROSEN:**  Right, and so -- oh, I'm sorry.

13   **THE COURT:**  No, no, I was only going to say, it sounds

14   like you and I at least have a common understanding that during

15   that appeal process, Mr. Harcevic would be kept locally here in

16   San Jose and that if and when the district judge either ruled

17   in favor or against the appeal, then changes would take place.

18   Is that fair?

19   **MS. ROSEN:**  Yes, I think that's right, and then if

20   the -- obviously, if the order were reversed, then he would

21   remain in custody and be removed at that time, and otherwise,

22   he would be released, and then we would have to get a new court

23   date, obviously, for him to appear.

24   **THE COURT:**  All right.  Mr. Harcevic -- Mr. Archer, go

25   ahead.

1          **MR. ARCHER:**  It's nearly my understanding, your Honor.

2    The only issue is that I think that the issue of a stay is

3    appropriate to be determined by the judge in St. Louis.

4          That's my only -- I don't think that there's statutory

5    authority for a stay from a magistrate court here, that there

6    is statutory authority under the Bail Reform Act to potentially

7    stay the execution of the release order here, but my

8    understanding is that that would have to come from St. Louis.

9          **MS. ROSEN:**  I don't believe that's right.  You can

10   stay your order, or at least stay it until Missouri issues a

11   stay.  Otherwise, he would be released before any appeal --

12         **THE COURT:**  That is my --

13         **MS. ROSEN:**  -- could be taken.

14         **THE COURT:**  That is my understanding, but as you all

15   have pointed out, we may getting ahead of ourselves here,

16   because....

17         Mr. Harcevic, I want you to understand what we're

18   talking about, and each of you should understand what I'm

19   talking about, as well.  Even though I have now issued an order

20   that Mr. Harcevic here be released, there are a couple of

21   things that have to happen in order for him to be actually

22   released and returned to home.

23         First, each of you is going to need to post the

24   property that I've identified and discussed with you, and once

25   you do that, the government then has the right, and I take the

1   government prosecutor at her word that the government will

2   exercise that right, to appeal my decision to the judge

3   presiding over the trial in St. Louis.

4          At that time, if the government indicates it wishes to

5   appeal my decision once the property's been posted, the

6   government may seek a stay of my order here in San Jose in

7   order to allow it to pursue that appeal.

8          So there are a number of steps that need to be

9   followed here in order for this to be carried out.  I want each

10  of you to understand this, and especially you, Mr. Harcevic,

11  that everyone appreciates that Mr. Harcevic is not going to be

12  released today or tomorrow or the next day.  There are a number

13  of steps that need to be followed.  I wish this were a more

14  streamlined, efficient process.  Unfortunately, it's the

15  process that we have.  But that's how things are going to

16  proceed.

17         You will have to post the property, and I suggest you

18  do that as quickly as you can, working with Mr. Archer, so that

19  this can be carried forward.  Once that happens, a stay is

20  likely to be requested, an appeal taken, and that issue will

21  have to be resolved in order for a final decision to be made.

22         Do you understand this, Mr. Harcevic?

23                        (Inaudible reply.)

24         **THE COURT:**  Okay, all right.

25         **MS. ROSEN:**  Your Honor, I guess one question I have,

1    and I'm just not sure of this, is, during the time that we're

2    waiting for the bond to get posted, I'm not sure there's any

3    prohibition or that there's not some requirement that he be

4    removed in the meantime.  I mean, he's now ordered removed, and

5    he will be in custody.  So I assume that he could end up in

6    Missouri while he is still waiting to post the property here,

7    and I'm not sure that there would be anything improper about

8    that.

9            **THE COURT:**  Well, let me --

10           **MS. ROSEN:**  Because I'm not sure, in terms of how the

11   removal works, once the removal order is made, I don't know

12   that if the marshals don't need to then send him to Missouri.

13           **THE COURT:**  Mr. Archer.

14           **MR. ARCHER:**  I think we'd be heading for a

15   inefficiency there, that there is potentially -- frankly, the

16   appeal issue may be dealt with *in absentia* quite expeditiously,

17   and he may be released, and so to put him into the marshal's

18   transport, which is a drawn-out process, sort of, there's no

19   access to counsel during that time; I think it's especially

20   problematic if they're planning on proceeding with the appeal

21   while he's in that transport.

22           I don't -- I guess I would ask the Court to stay the

23   removal order while it's being dealt with here.  I don't think

24   that any of it's going to be necessarily fully resolved --

25   I would hope it would be, but there's potential for it not to

1    happen before next court date, honestly.

2            **THE COURT:**  I understand what you're saying.

3            Ms. Rosen, go ahead.

4            **MS. ROSEN:**  Well, if that's going to happen, then

5    I think we need a deadline for when this is going to happen, so

6    it doesn't end up in limbo, that he doesn't get removed --

7            **THE COURT:**  Well, this is my primary concern, is that

8    Mr. Harcevic be moving in some direction, one way or the other,

9    and not just be stuck in limbo, as you say.

10           I take it from what I've heard from the sureties and

11   custodian this afternoon, that everyone is incented here to get

12   this done as quickly as possible, but a deadline works all

13   kinds of wonders in that fashion.  So I think it's a good

14   suggestion.

15           Might I simply suggest that I stay my removal order

16   for something like five days or whatever till early next week,

17   so that the sureties can post their property?

18           **MR. ARCHER:**  I guess my only question is, if I could

19   ask the government, assuming that the government is going to be

20   appealing the order --

21           **THE COURT:**  I'm sure you can count on it, Mr. Archer.

22           **MR. ARCHER:**  Yeah, I'm confident of that, but my

23   question is, we're prepared to go through the process of having

24   a full, certified title report done.  That's a more difficult

25   deadline to meet in five days, if that's what the government's

1  requiring, but your Honor, with the state of the real estate

2  market being quite different than 2008 when we were having

3  trouble in terms of equity, I would just ask whether the

4  government would be satisfied with a Zillow estimate or a

5  drive-by estimate as well as --

6            **THE COURT:**  I won't guess, but --

7            **MS. ROSEN:**  No, no, we absolutely need the property --

8  the full property reports, and I guess that -- I mean, the

9  appeal really has nothing to do with it.  It's just whether

10 he's moving during the time that he's trying to post the

11 property.  So if you're going to stay the removal, you know,

12 you can do that.  I'm not sure Missouri is going to be thrilled

13 with that, but that's okay --

14           **THE COURT:**  I'm sure.

15           **MS. ROSEN:**  -- but then we do need a deadline for when

16 he's going to get us the property reports, and everything is

17 supposed to -- if that doesn't happen in a certain amount of

18 time, it will move forward.

19           **THE COURT:**  Let me make this suggestion.  Might we

20 alternatively stay the removal order for something like 14

21 days?  If, for some reason, 14 days is insufficient to cure the

22 certified reports that we're talking about, Mr. Archer can

23 certainly make a request of the Court to continue the stay --

24           **MR. ARCHER:**  Thank you, your Honor.

25           **THE COURT:**  -- and in that period of time, hopefully

1    the paperwork will be completed.  Once it's on file, then the

2    government may request a stay of my release order to allow an

3    appeal to be taken --

4              **MS. ROSEN:**  Exactly.

5          **THE COURT:**  -- in the Eastern District.  Okay, does

6    everybody understand what we're going to do here?

7              **MR. ARCHER:**  Yes, your Honor.

8          **THE COURT:**  Okay, then hopefully the minutes will

9    reflect that, and I will make sure that that's the case.

10             All right, you have a question, sir?

11                 (Inaudible response.)

12         **THE COURT:**  Let me explain this to you one more time.

13   This is -- your question is a fair one, sir, because frankly,

14   this process doesn't do any of us any honors.

15             In order for Mr. Harcevic here to be released

16   according to the order that I just signed, by our rules of

17   court and by my order, you all have to post your property,

18   okay?  And let's assume that you can do all of that in a matter

19   of three or four days.

20             Once that is posted, I am then in a position to sign

21   this order and allow Mr. Harcevic to be released.  Once I sign

22   this order, the government has indicated that it wishes to

23   appeal my decision before the district judge in Missouri.  And

24   so once I sign the order, the first step the government will

25   take is to ask me to stay my order, to stop it, so that

1  Mr. Harcevic remains in custody and an appeal can be taken.

2          Assuming that's what happens, and assuming I grant the

3  stay, then the appeal will play out in St. Louis.  If the judge

4  in St. Louis agrees with me that Mr. Harcevic can be released

5  on these conditions, the judge will indicate so in an order,

6  and then Mr. Harcevic will be released as I've described here.

7          If the judge in St. Louis disagrees with me and says,

8  no, Mr. Harcevic needs to remain in custody, then Mr. Harcevic

9  will be kept in custody and returned to St. Louis, where he

10  will stay in custody as the case moves forward.

11          That's the issue, if you can understand it.  Did

12  I answer your question?

13          **UNIDENTIFIED SPEAKER:**  Yes.

14          **THE COURT:**  Okay.  All right, does everybody --

15  Ms. Rosen.

16          **MS. ROSEN:**  I'm sorry.  I just wondered if we need a

17  new date, assuming that the property gets posted, to appear, so

18  that we can move to stay the release order.

19          **THE COURT:**  I am happy to give you a date, just so

20  that we are on calendar.  I think -- well, as I said, I've set

21  a stay of 14 days of my removal order to allow this to all

22  happen.

23          What would you propose, given that?

24          **MR. ARCHER:**  I would agree, your Honor.  The only --

25  my only issue is that perhaps we could come back on -- that

1    would be March 10th, I believe, but I'm intending to be -- that

2    would be March 10th, but I'm actually going to be with family

3    that day, I think.  So if we could maybe do March 11th.

4              **THE COURT:**  Okay.  I have no problem --

5              **MS. ROSEN:**  Well, by then the -- oh, I'm sorry, go

6    ahead.

7              **THE COURT:**  By then the order will have expired,

8    right?  So I would actually suggest moving it ahead of that

9    date.

10             **MR. ARCHER:**  Okay.

11             **THE COURT:**  Does March 9th work for you?

12             **MS. ROSEN:**  Or the other thing is, we can be in

13   contact, and then if -- when the timing, when they have a

14   better idea of when they actually have the property --

15             **THE COURT:**  Okay.

16             **MS. ROSEN:**  -- we could call Oscar and put it on

17   calendar.

18             **THE COURT:**  Might I suggest we do that, for all sorts

19   of reasons.  Let's just proceed in that -- I want the stay to

20   be understood as lasting 14 days, or extending 14 days.  As

21   soon as you were in a position to post the property, can

22   I count on counsel to communicate, so that the government may

23   then request a hearing to make its stay motion of my release

24   order?  Is that fair?

25             **MR. ARCHER:**  Yes, your Honor.

1          **MS. ROSEN:**  Thank you.

2          **THE COURT:**  Okay, let's proceed along those lines.

3   Unless there's anything else, Mr. Archer...?

4          **MR. ARCHER:**  I do have some things I would raise

5   about --

6          **THE COURT:**  Yes.

7          **MR. ARCHER:**  -- just very briefly, and they're

8   potentially not quite ripe, but his treatment at the jail has

9   been sub par, I'd have to say, and I'm going to speak with the

10  marshals this afternoon.  I have not yet had an opportunity to

11  do so, so I can't -- I certainly can't say the marshals haven't

12  addressed these issues, they've been very responsive in the

13  past, but I did want to put on record that he has followed the

14  procedures to request either halal or vegetarian meals.  He has

15  put in for -- he put in a white medical card about seven days

16  ago, requesting such.

17          He was not given any access to the chaplain to go

18  through that process.  I spoke with the sergeant last night.

19  They shrugged their shoulders and said, if you put the card in,

20  he has to go through the chaplain, and that's frankly

21  unacceptable.

22          His dietary needs -- they don't identify the mystery

23  meat that's being provided there.  He's doing his best to avoid

24  pork.  And I put in a request myself for the vegetarian food.

25          And additionally, he began in general population, was

1   then without explanation brought up to a level four, which is a

2   much higher security, which is understandable given the nature

3   of the charges.  That's a setting where he's in isolated cells

4   with other isolation cells around him.  He is given day room.

5          Yesterday, when I went to visit him, he was put

6   basically in the back, in a dungeon, which is the E-dorm on the

7   Second Floor East, which is a completely unacceptable place for

8   him to be.  He's now considered a level five.  I spoke with the

9   sergeant; there's been no disciplinary problem, there have been

10  no problems interacting with other people who are detained

11  there.

12         So I'm going to try to work through that with the

13  marshals and with the jail.  I'm a little frustrated by that

14  process so far, and so I'm mostly just complaining in court

15  about it, and I may follow up with a proposed order, if I think

16  we'll make it with....

17         **THE COURT:**  All right, well, your motion to complain

18  is granted, Mr. Archer --

19         **MR. ARCHER:**  Thank you, your Honor.

20         **THE COURT:**  -- but beyond that, I look forward to any

21  more formal request as it's presented.

22         Unless there's anything else, counsel...?

23         **MS. ROSEN:**  No, thank very much, your Honor.

24         **THE COURT:**  Thank you all.

25         **MR. ARCHER:**  No, thank you.

1      **THE COURT:**  Have a good afternoon.

2          (Matter in recess from 2:59 p.m. to 3:14 p.m.)

3        (Defendant no longer present.  Ms. Rosen not present.

4                    Mr. Fry now present.)

5      **THE COURT:**  Mr. Rivera, you want to recall the matter?

6   Apparently, Mr. Fry will stand in.  If necessary, we can

7   suspend proceedings to get Ms. Rosen here, but I'm hoping that

8   won't be necessary.

9      **MR. FRY:**  Yeah, Gary Fry, standing in for Amber Rosen

10  on behalf of the United States.

11     **MR. ARCHER:**  And Graham Archer for Mr. Harcevic.

12  I can waive his appearance just for this -- just to say, your

13  Honor, it appeared we thought we had one surety missing.  We

14  don't.  We don't need to recall the case.  That's all, so --

15     **THE COURT:**  All right, gentlemen, I think we're done.

16     **MR. ARCHER:**  Okay, thank you.

17     **THE COURT:**  Thank you.

18                                              3:14 p.m.

19                    ---o0o---

20

21

22

23

24

25

1

2

3                    **CERTIFICATE OF TRANSCRIBER**

4

5         I, Leo Mankiewicz, certify that the foregoing is a

6    true and correct transcript, to the best of my ability, of the

7    above pages of the official electronic sound recording provided

8    to me by the U.S. District Court, Northern District of

9    California, of the proceedings taken on the date and time

10   previously stated in the above matter.

11        I further certify that I am neither counsel for,

12   related to, nor employed by any of the parties to the action in

13   which this hearing was taken; and, further, that I am not

14   financially nor otherwise interested in the outcome of the

15   action.

16

17   _____  03/23/2015

18        Signature of Transcriber          Date

19

20

21

22

23

24

25