**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>RAMIZ ZIJAD HODZIC,<br>  a/k/a Siki Ramiz Hodzic<br><br>SEDINA UNKIC HODZIC,<br><br>NIHAD ROSIC,<br>  a/k/a Yahya Abu Ayesha Mudzahid,<br><br>MEDIHA MEDY SALKICEVIC, and<br>  a/k/a Medy Ummuluna,<br>  a/k/a Bosna Mexico,<br><br>ARMIN HARCEVIC,<br><br>Defendants. | Case No. 4:15-CR-0049 CDP- DDN<br><br>**DEFENDANTS' JOINT<br>MOTION TO DISMISS COUNTS<br>ONE AND THREE** |

_____

<u>MOTION TO DISMISS COUNTS ONE AND THREE</u>

Defendants move that the Court find, for the reasons set forth below, that hostile acts against the Assad regime, as part of legitimate warfare, constituted lawful combat under United States law and are therefore immune from prosecution under 18 U.S.C. § 2339A, via 18 U.S.C. § 956. Accordingly, Defendants further request that this Court dismiss Counts One and Three against them for failing to state an offense, because the plain language of the Indictment necessarily charges the lawful conduct of combat against the Assad regime, and Ramo Abdullah Pazara was entitled to combatant immunity for those acts.

1

**Introduction**

The Syrian conflict began in early 2011. On February 16, at the height of the Arab Spring, a fourteen-year-old student, Naief Abazid, painted on the side of his school: "It's your turn, Doctor Bashar al-Assad."[1] The Syrian government arrested and tortured him along with 22 of his classmates.[2] The boys' torture set off a wave of pro-democracy protests across Syria.[3] The Syrian government responded to these mostly peaceful protests with military force. By March, protesters began calling for the overthrow of Assad's government.[4]

In July 2011, seven officers defected from the Assad military and announced the formation of the Free Syrian Army (FSA).[5] The group called on all members of the Syrian army to defect and join the FSA. It also pledged to protect the Syrian people from "the armored killing machine" of the Assad regime and sought to unify the growing Syrian opposition.[6] It declared that "all security forces attacking civilians are from now on justified targets to be neutralized by FSA."[7] Even in the early stages of the Syrian conflict, the FSA was a well-organized fighting force with a command structure and sophisticated weaponry.[8]

---

[1] Mark MacKinnon, *The Graffiti Kids Who Sparked the Syrian War*, GLOBE & MAIL (Dec. 2, 2016), https://goo.gl/JXHiGR.

[2] *Id.*

[3] *Id.*

[4] Madeline Conway, *Timeline: U.S. Approach to the Syrian Civil War*, POLITICO (April 7, 2017), https://goo.gl/oMOnGY.

[5] Joshua Landis, *Free Syrian Army Founded by Seven Officers to Fight the Syrian Army*, SYRIA COMMENT (July 29, 2011), https://goo.gl/EP2c45.

[6] *Id.*

[7] *Id.*

[8] Joshua Landis, *Free Syrian Army Getting Attention*, SYRIA COMMENT (Nov. 30, 2011), https://goo.gl/ESfjdu.

By August 2011, Assad had killed more than 2,000 Syrian civilians and had dispatched military troops and tanks to confront protestors.[9] As fighting between the Assad regime and opposition forces intensified, President Obama, on August 18, 2011, called on Bashar al-Assad to resign. "For the sake of the Syrian people," he wrote, "the time has come for President Assad to step aside."[10] The leaders of France, Germany, and Britain followed suit, urging Assad "to face the reality of the complete rejection of his regime by the Syrian people."[11]

In October 2011, rebel groups formed the Syrian National Council (SNC) in Istanbul, Turkey on October 2, 2011.[12] At this early stage of the Syrian civil war, the SNC was "the biggest and most significant Syrian opposition group."[13] In April 2012, over 100 countries, including the United States, recognized the SNC as "the umbrella organization under which Syrian opposition groups are gathering" and as "a legitimate representative of the Syrian people."[14] Nevertheless, the group "faced persistent difficulty maintaining internal unity and cohesion."[15] In March 2012, the SNC announced that it would be coordinating the transfer of arms to the FSA.[16] On July 23, 2012, the United States Office of Foreign Assets Control (OFAC) granted a United States nonprofit organization, the Syrian Support Group, Inc. (SSG), a license to support the FSA.[17]

By August 2012, the Syrian conflict had metastasized into a full-scale civil war.

---

[9] Scott Wilson & Joby Warrick, *Assad Must Go, Obama Says*, WASH. POST (Aug. 18, 2011), https://goo.gl/Rywu68.

[10] *Id.*

[11] *Id.*

[12] DIWAN, *The Syrian National Council* ("*Syrian National Council*"), CARNEGIE MID. E. CTR. (Sept. 25, 2013), https://goo.gl/7gKtU8.

[13] *Id.*

[14] *Id.*

[15] *Id.*

[16] *Id.*

[17] DEP'T OF THE TREASURY, *Syrian Sanctions Regulations License* ("SSG License), License No. SY-2012-294747-1, https://goo.gl/YSpgo1.

On August 20, President Obama issued a warning to the Assad regime against using chemical weapons.[18]  He stated that any use of chemical weapons by Assad would change the United States' "calculus."[19] If Assad used such weapons, he would cross a "red line" and be "held accountable by the international community."[20]

On October 31, 2012, Secretary of State Hillary Clinton announced that the United States no longer considered the SNC "the visible leader of the opposition."[21] She called for an even broader opposition coalition that would fully represent "those who are in the frontlines, fighting and dying today to obtain their freedom."[22] At the height of the fighting in Syria, there were more than 1,000 diverse armed opposition groups.[23]

In November 2012, a broad coalition of Syrian opposition groups signed an agreement in Doha, Qatar, creating the National Coalition of Syrian Revolutionary and Opposition Forces (SOC). The SOC was "left open to all hues of the Syrian opposition" and "agreed to bring down the regime and all its symbols and mainstays."[24] The group included "the Supreme Military Council representing the Free Syrian Army."[25] On December 11, 2012, the President of the United

---

[18] James Bell, *Obama Issues Syria a "Red Line" Warning on Chemical Weapons*, WASH. POST (Aug. 20, 2012), https://goo.gl/MQmSjP.

[19] *Id.*

[20] *Id.*

[21] *Syrian National Council*, *supra* note 12.

[22] *Id.*

[23] BBC Staff, *Guide to the Syrian Rebels*, BBC NEWS (Dec. 13, 2013), https://goo.gl/geBAWO.

[24] *The Syrian Opposition's Doha Agreement* ("*Doha Agreement*"), ARABSAGA (Nov. 12, 2012, 8:40 AM), https://goo.gl/EkT6J0.

[25] NAT'L COAL. OF SYRIAN REVOLUTION & OPPOSITION FORCES, *Fact Sheet*, https://goo.gl/8BK9nc (last visited June 17, 2017).

States recognized this broad opposition group as "the legitimate representative of the Syrian people."[26] The Department of State confirmed the next day that this was the United States' policy.[27] In June 2013, President Obama publicly "authorized his administration to provide arms to rebels fighting Syrian President Bashar al-Assad."[28]

On August 21, 2013, a year after President Obama warned Assad against using chemical weapons, the Syrian government crossed President Obama's "red line" and used chemical weapons on its own people.[29] These "outlawed toxins . . . kill[ed] nearly 1,500 civilians, including at least 426 children."[30]

On September 10, President Obama addressed the nation on Syria's use of chemical weapons:

> Over the past two years, what began as a series of peaceful protests against the repressive regime of Bashar al-Assad has turned into a brutal civil war. Over 100,000 people have been killed. Millions have fled the country. In that time, America has worked with allies to provide humanitarian support, to help the moderate opposition, and to shape a political settlement. But I have resisted calls for military action, because we cannot resolve someone else's civil war through force, particularly after a decade of war in Iraq and Afghanistan.
>
> The situation profoundly changed, though, on August 21st, when Assad's government gassed to death over a thousand people, including hundreds of children.[31]

---

[26] NPR Staff, *Obama Recognizes Rebels As "Legitimate Representatives" of Syrian People*, NPR (Dec. 11, 2012), https://goo.gl/SwA927.

[27] U.S. Dept. of State Press Release, Remarks to the Friends of the Syrian People (Dec. 12, 2012), https://goo.gl/QmjOc2 (archived Apr. 13, 2015).

[28] Adam Entous & Julian E. Barnes, *U.S. to Arm Syrian Rebels*, WALL ST. J. (June 14, 2013, 5:29 AM), https://goo.gl/Bh2Yh8.

[29] Joby Warrick, *More Than 1,400 Killed in Syrian Chemical Weapon Attack, U.S. Says*, WASH. POST (Aug. 30, 2013), https://goo.gl/AP69SU.

[30] *Id.*

[31] White House Press Release, Remarks by the President in Address to the Nation on Syria ("Syria Address on Chemical Weapons") (Sept. 10, 2013), https://goo.gl/swQ1DH.

At that point, President Obama began seeking authorization from Congress for direct military action against the Assad regime, in addition to the indirect support the United States was already providing to the opposition.[32]

Against this backdrop, the Government charged Defendants with supporting Ramo Abdullah Pazara, a Bosnian who traveled to Syria to fight against the Assad regime.

Defendants move to dismiss Counts One and Three of the Indictment, because they charge the Defendants with supporting conduct that is protected by combatant immunity. Count One of the Indictment charges the Defendants with violation of 18 U.S.C. § 2339A, beginning on an unknown date "no later than in May 2013" until February 2015, for conspiring to contribute material support in the form of money and property to support a conspiracy to commit murder and maiming abroad. Count Three of the Indictment charges the Defendants with separate violations of 18 U.S.C. § 2339A for materially supporting the conspiracy to commit murder and maiming abroad. Specifically, the Government alleges that the Defendants sent money to a financial account used by defendant Siki Ramiz Hodzic with the knowledge and intent that the funds would be provided to Ramo Abdullah Pazara for fighting in Syria.

The Government alleges that the conspiracy to murder and maim was composed of Pazara along with other individuals located in Serbia, Bosnia and Herzegovina, and Montenegro. Pazara and his compatriots are alleged to have engaged in a conspiracy to commit murder and maiming abroad by "travelling to Syria, Iraq, and elsewhere to support the designated FTOs and act as foreign fighters **by participating in the ongoing conflict** and otherwise engaging in acts of violence, [] including killing and maiming persons." Indictment Introduction, ¶ 12 (emphasis added).

---

[32] *Id.*

The allegation of fighting in Syria necessarily includes hostilities directed against the armed forces of the Bashar al-Assad regime and other combatant groups in Syria. During the period of the alleged conspiracy, the designated FTOs named in the indictment—along with the FSA and other rebel fighters supported, directly or indirectly, by the United States Government—were all fighting against the Government of Bashar al-Assad and "supporting" each other. The alleged "conspiracy to murder and maim" is based in whole or in part on Pazara and his compatriots' armed hostilities against the Assad regime's military forces.

Defendants maintain that the actions of Pazara and those with him did not constitute murder and maiming abroad as alleged and are, in fact, protected from prosecution as acts of legitimate warfare under the doctrine of combatant immunity. Specifically, Defendants proffer, by a preponderance of the evidence, the following:

- The Bosnians with whom Pazara was associated initially affiliated themselves with the Free Syrian Army (FSA) and were later placed under the control of a group called Jaish al-Muhajireen wal-Ansar (JMA);

- Both the FSA and JMA engaged in hostile activities principally against the forces of Bashar al-Assad, and the Bosnian unit Pazara joined complied with the laws of war;

- The Bosnians participated largely in a support role, performing guard and cooking duties for combat forces, and they conducted these activities in accordance with the laws of war;

- In public comments, the President of the United States recognized the legitimacy of rebel combat units, such as the FSA and JMA, noting that, "[a]t this point we have a well-organized-enough coalition—opposition coalition that is representative—that we can recognize them as the legitimate representative of the Syrian people";[33]

---

[33] Mark Landler & Michael R. Gordon, *Obama Says U.S. Will Recognize Syrian Rebels*, N.Y. TIMES (Dec. 11, 2012), https://goo.gl/GJJJDK.

- Neither the FSA nor JMA were designated FTOs when Defendants allegedly supported Pazara;[34]

- Pazara's unit was not fighting under the direction or control of a designated FTO;[35] and

- Fighters in Pazara's unit qualified for combatant immunity for their acts of legitimate warfare against the Bashar al-Assad regime.

Pazara and his compatriots' armed hostilities against the Assad regime's military forces constituted acts of legitimate warfare. The Government cannot prosecute Defendants for supporting acts of legitimate warfare under § 2339A.

## Factual background

Abdullah Ramo Pazara arrived at the border of Turkey and Syria in July 2013. Exhibit 2 at 2. There, he met another fighter, Jasmin Jasaveric. Jasaveric was a fellow Bosnian. Exhibit 2 at 2. They were instructed by a group called Nour al-Din al-Zenki, which was under the command of the FSA. Exhibit 2 at 2. While they received instructions from the FSA, civilians drove them in to Syria. Exhibit 2 at 2-3. At that time, it was easy to travel into Syria from Turkey. Exhibit 2 at 2-3. When Pazara arrived in Turkey, he had no plan to join a specific group, but he knew that he wanted to fight against the Assad regime. Exhibit 2 at 3.

Pazara was affiliated with multiple groups during his time in Syria. Most of the time, he was stationed just to the east of Aleppo. Exhibit 1 at 3. He fought directly with the FSA for the

---

[34] President Obama declared JMA a Specially Designated Global Terrorist (SDGT) on September 24, 2014, after Pazara had left the group. U.S. DEP'T OF STATE, *Designation of Foreign Terrorist Fighters*, https://goo.gl/nrSwUu (archived Jan. 19, 2017). On September 23, 2015, after the date of the alleged conspiracy, JMA joined Jabhat al-Nusra, a designated terrorist organization.

[35] *See* Joanna Paraszczuk, *Video: Umar Shishani, the Caucasus Emirate & ISIS*, FROM CHECHNYA TO SYRIA (Sept. 11, 2013), https://goo.gl/taJmtr ("Umar [Shishani, the leader of JMA,] has cooperated with ISIS during the battle for Menagh Airbase in Aleppo . . . but so far the [JMA] have not formally sworn allegiance to the faction. Indeed, tensions in the relationship with ISIS have led to divisions and splits in [JMA].").

first two or three weeks. Exhibit 2 at 3. The FSA provided Pazara and Jasaveric with clothing, food, and accommodation in houses in the city. Exhibit 2 at 3. Jasaveric reported seeing American-made weapons. Exhibit 1 at 3. Jasaveric and Pazara's duties included securing the hospital and helping the injured, no matter who they were. They would also work in the kitchens and distribute food. Exhibit 1 at 4.

After the first few weeks fighting with the FSA, Jasaveric and Pazara were placed under the command of Jaish al-Mujajireen wal-Ansar (JMA). Exhibit 1 at 4; Exhibit 2 at 3. Their leader in JMA was Salahuddin al-Shishani, not Omar al-Shishani. Exhibit 1 at 4; Exhibit 2 at 3. Even when they were with JMA, they were part of a broad coalition united in fighting against the Assad regime. "[M]ost of the Bosnians seemed to feel they were aligned with or fighting for the FSA." Exhibit 1 at 3. Indeed, at that time, JMA "fought under the umbrella of the U.S.-backed Free Syrian Army, which was visited by Senator John McCain." Exhibit 1 at 4. The Bosnia unit, however, stuck together based on their shared culture and ethnicity. *See* Exhibit 1 at 3.

In January 2014, Pazara joined another group called the Bayt Commandos. Exhibit 2 at 3. Jasarevic chose not to join Pazara and returned home to Bosnia. Exhibit 2 at 3.

Although their unit changed alliances, Jasaveric and Pazara remained with the same Bosnian unit from July 2013 to at least January 2014. In this unit, there was "a clear hierarchy with commanders identified by insignia, rank, and special duties ranking from artillery to paramedics to platoon sized fighting units." Exhibit 1 at 5. The Bosnians were at the bottom of the hierarchy. According to Jasarevic, one of the Arab commanders of the unit once "punished the Bosnians for spending too much time on Facebook by putting them in charge of peeling potatoes for the troops." Exhibit 1 at 4. The Bosnian unit was known at the "Potato Peeler or Facebook Brigade." Exhibit 1 at 4. As Jasarevic put it, "The Chechens were wolves and we were like little coyotes following

9

them." Exhibit 1 at 4. Despite their low station, the Bosnians were an organized fighting unit with insignia and were stationed in barracks. The Bosnians were distinguished by their uniforms, berets, insignia, hierarchy, flags, etc." Exhibit 1 at 4. "[T]hey were on the edges of events beyond them that they clearly could not control or comprehend." Exhibit 1 at 7.

**Arguments and Authorities**

**I.     The Government cannot prosecute support of legitimate warfare under § 2339A as an act of murder and maiming abroad.**

Defendants cannot be convicted for violating or conspiring to violate 18 U.S.C. § 2339A for supporting acts of legitimate warfare, because § 2339A incorporates United States law. Under United States law, acts of legitimate warfare during a civil war are not murder and are entitled to combatant immunity. Nothing in § 2339A's legislative history suggests that Congress intended to supersede well-established United States law of war, and statements in the history of related legislation imply that Congress did not intend § 2339A to apply in combat situations. The United States recognizes that belligerents in a civil war cannot be prosecuted for acts of legitimate warfare.

**A.     Legitimate acts of warfare may not be charged under the plain language of the charging statute.**

The charging statute, 18 U.S.C. § 2339A, incorporating 18 U.S.C. § 956, prohibits, in relevant part, supporting or conspiring to support a conspiracy "to commit at any place outside the United States an act that would constitute the offense of murder, kidnapping, or maiming **if committed in the special maritime and territorial jurisdiction of the United States**." 18 U.S.C. § 2339A; 18 U.S.C. § 956 (emphasis added). The statute incorporates the definition of "murder" in 18 U.S.C. § 1111. Section 1111 defines murder as "the **unlawful** killing of a human being with malice aforethought." 18 U.S.C. § 1111(a) (emphasis added). Crucially, United States law controls.

Under United States law, killing an enemy soldier as part of legitimate warfare is not an "unlawful killing." *See United States v. Perruccio*, 4 U.S.C.M.A. 28, 30 (1954) ("[I]t is beyond dispute that the killing of an enemy in time of war is lawful."); *Manual For Courts-Martial* (2000 ed.), R.C.M. 916 ("[K]illing an enemy combatant in battle is justified"); Georg Schwartzenberger, *Human Rights and Guerilla Warfare*, 1 ISR. Y.B. HUM. RTS. 246, 246 (1971) ("[C]ombatants are legitimate objects of armed attack."). There is nothing in the statute to suggest that these fundamental principles of the United States law of war should be ignored.  Read, as it must be, in the light of these principles, the charging statute, 18 U.S.C. § 2339A, does not authorize prosecuting someone for supporting legitimate acts of warfare.

**B.      The legislative history of the charging statute and related terrorism statutes reveals intent to leave the United States law of war intact.**

Nothing in the legislative history of 18 U.S.C. § 2339A suggests an intent on the part of Congress to criminalize the support of legitimate acts of war. On the contrary, drafters specifically discussed the fact that the United States terrorism legislation would not apply in "combat" situations. *See, e.g.*, Antiterrorism Act of 1986: Hearing Before the Subcomm. on Crimes of the House Comm. of the Judiciary, 99th Cong. 2d Sess. (March 4, 1986), at 50 (distinguishing between combat situations and acts of terrorism and noting that precursor terrorism legislation would not apply to the former). Likewise, at several points in the debates surrounding H.R. 5613 and S. 2626, precursors to a related statute, 18 U.S.C. § 2339B, the distinction between acts of war and acts of terrorism was discussed at length. *See, e.g.*, Legislative Initiatives to Curb Domestic and International Terrorism: Hearings on S. 2626 Before the Subcomm. on Security and Terrorism of the Senate Subcomm. of the Judiciary, 98th Cong., 2d Sess. (1984), at 90 ("Senate Hearings S. 2626"); Legislation to Combat International Terrorism: Hearings on H.R. 5613 Before the House Comm. on Foreign Affairs, 98th Cong., 2d Sess. At 59-61 (1984) ("House Hearings H.R. 5613") (noting

11

"terribly important" distinction between insurgencies and terrorists) (statement of Arnold, Sr. Deputy for Counter-Terrorism and Emergency Planning, Department of State).

There is, therefore, no basis to conclude that Congress intended to supersede the established principle of the United States law of war that belligerents cannot be tried for their acts of legitimate warfare. Regardless, the plain language of the statute controls.

**C.     The United States recognizes that, under some circumstances, a civil war constitutes legitimate warfare in which the laws of war, including combatant immunity, apply.**

In *The Prize Cases*, in the context of the United States Civil War, the Supreme Court explained the five elements of "legitimate warfare" as follows:

> Insurrection against a Government may or may not culminate in an organized rebellion, but a civil war always begins by insurrection against the lawful authority of the Government. A civil war is never solemnly declared; it becomes such by its accidents—the number, power, and organization of the persons who originate and carry it on. When the party in rebellion [1] occupy and hold in a hostile manner a certain portion of territory; [2] have declared their independence; [3] have cast off their allegiance; [4] have organized armies; [5] have commenced hostilities against their former sovereign, the world acknowledges them as belligerents, and the contest a war.

*Brig Amy Warwick* (*The Prize Cases*), 67 U.S. (2 Black) 635, 666-67 (1863). When these five elements are established, the war's "actual existence is a fact . . . which the [courts are] bound to notice and to know." *Id.* The Court further explained that a conflict "is not the less a civil war, with belligerent parties in hostile array, because it may be called an 'insurrection' by one side, and the insurgents be considered as rebels or traitors." *Id.* at 669.

**D.     Under United States law, combatant immunity extends to belligerents for acts of legitimate warfare in the context of a civil war.**

After *The Prize Cases*, the Supreme Court recognized that individual belligerents in a civil war were entitled to combatant immunity for their acts of legitimate warfare. *Ford v. Surget*, 97

U.S. 594, 602 (1878). In *Ford*, the Court affirmed a defense verdict for a member of the Confederate Army who had destroyed the property of the plaintiff, a civilian, in the context of waging the Civil War. *Id.* at 606-07. The Court noted at the outset that exemption from liability for acts of legitimate warfare constitutes one of the "principles of public law, as applicable to civil and international wars, . . . [that is] settled by, or are plainly to be deduced from, [the Court's] former decisions." *Id.* at 604-05. Members of the Confederate army were exempt "from liability for acts of legitimate warfare." *Id.* at 605.

This principle also applies in a criminal context. In *Dow v. Johnson*, 100 U.S. 158 (1879), the Supreme Court held:

> This doctrine of non-liability to the tribunals of the invaded country for acts of warfare is as applicable to members of the Confederate army, when in Pennsylvania, as to members of the National army when in the insurgent States. The officers or soldiers of neither army could be called to account civilly **or criminally** in those tribunals for such acts, whether those acts resulted in the destruction of property or **the destruction of life**.

*Id.* at 169 (emphasis added). The Court regarded this principle of non-liability as self-evident: "It is difficult to reason upon a proposition so manifest; its correctness is evident upon its bare announcement, and no additional force can be given to it by any amount of statement as to the proper conduct of war." *Id.* at 165. The principle of non-liability for acts of legitimate warfare applied even though the Confederate Army was unsuccessful. *Underhill v. Hernandez*, 168 U.S. 250, 253 (1897), *superseded on other grounds* by 22 U.S.C. § 2370 ("If the political revolt fails of success, still if actual war has been waged, acts of legitimate warfare cannot be made the basis of individual liability.").

This doctrine of non-liability for legitimate acts of warfare applied to the Confederacy even though the Supreme Court had long held the Confederacy was not even a *de facto* Government. *Williams v. Bruffy*, 96 U.S. 176, 182 (1877) ("Whilst it existed, [the Confederacy] was regarded .

13

. . as simply the military representative of the insurrection against the authority of the United States.") (internal quotation omitted); *see also* Trial of T.E. Hogg and others, G.O. 52, HQ, Department of the Pacific, June 27, 1865, reprinted in [Series II] 7 WAR OF THE REBELLION: OFFICIAL RECORDS OF THE UNION AND CONFEDERATE ARMIES ("OFFICIAL RECORDS") 674, 677 (1899) ("[C]ivil wars are not distinguishable from other wars as to belligerent and neutral rights . . .  in such contests the principles of public law in relation to belligerents must govern, and all the rights which a state of war gives to public enemies are to be allowed to the respective parties engaged in them.") (quoting "Stevenson to Palmerston").

The key factor is not whether the defendant is fighting for a legitimate Government, but rather whether the defendant is engaged in "legitimate warfare." *See Linder v. Portocarrero*, 963 F.2d 332, 337 (11th Cir. 1992) (noting "the generally accepted premise that acts of *legitimate warfare* cannot be made the basis for individual liability") (emphasis in original). The United States, then, recognizes the principle that belligerents in a civil war are entitled to combatant immunity and are not committing murder when they engage in acts of legitimate warfare.

**II.     The armed hostilities in Syria during the charged period of the conspiracy constituted legitimate warfare in which combatant immunity prohibits the charging of combatants for belligerent acts.**

**A.     The war in Syria meets the *Prize Cases* factors.**

Because the Syrian conflict satisfied the Supreme Court's elements for a civil war during the charged period of the alleged conspiracy, this Court is "bound to notice and to know" of the war's existence. *The Prize Cases*, 67 U.S. at 667; *see also United States v. Hamburg-Amerikanische Packetfahrt-Actien Gesellschaft*, 239 U.S. 466, 475 (1916) (taking judicial notice of "the European war which is now flagrant"); *Hagner v. United States*, 285 U.S. 427, 432 (1932) (noting

14

that courts could take judicial notice that a crime was committed while the United States was at war).

First, the Syrian rebels occupied land and held it in a hostile manner. *The Prize Cases*, 67 U.S. at 666. As early as January 2012, Reuters reported that "large swathes of land [were] regularly falling into rebel hands."[36] The New York Times likewise noted on March 8, 2013, that the United States was "funneling about $60 million" through nonprofits to deliver money "to the most stable opposition-controlled territory."[37] Thus, not only did the rebels occupy and hold territory in a hostile manner, but the United States government was funneling money and resources into this "stable" rebel territory.

During the period of the alleged conspiracy, the Syrian rebels also satisfied the second and third elements of the Supreme Court's test. The rebels had unambiguously declared their independence and cast off their allegiance to the Assad dictatorship. *The Prize Cases*, 67 U.S. at 666. On November 11, 2012, a broad coalition of opposition groups—"left open to all hues of the Syrian opposition"—signed an agreement in Doha, Qatar.[38] In that agreement, the newly-formed National Coalition of Syrian Revolutionary and Opposition Forces ("Syrian Opposition Coalition" or "SOC") announced its goal to "form an Interim Government after receiving international recognition."[39] The SOC also "agreed to bring down the regime and all its symbols and mainstays, to disband the regime's security services and to call to account those responsible for crimes against

---

[36] Khaled Yacoub Oweis, *Syria's Army Weakened by Growing Desertions*, REUTERS (Jan. 13, 2012, 6:42 PM), https://goo.gl/G7Y2s2.

[37] David D. Kirkpatrick, *In Parts of Syria, Lack of Assistance "Is a Catastrophe"*, N.Y. TIMES (March 8, 2013), https://goo.gl/Z5a7Sg.

[38] *Doha Agreement*, *supra* note 24.

[39] *Id.*

Syrians."[40] A month after this agreement was signed, on December 11, 2012, the Obama administration publicly recognized this broad coalition of rebels as "the legitimate representative of the Syrian people."[41]

Finally, the Syrian conflict satisfies the fourth and fifth elements of the Supreme Court's test. During the alleged period of the conspiracy, the rebels had organized armies and commenced hostilities against the Assad dictatorship. *The Prize Cases*, 67 U.S. at 666-67. Even the Assad regime acknowledged this fact. In a television interview around August 29, 2012, Bashar al-Assad stated, "We are fighting a regional and global war, so time is needed to win it."[42] For its part, the United States government acknowledged that Assad was "drag[ing] his country into civil war" as early as August 20, 2012.[43] At that point, President Obama called on Assad to step down because he had "lost legitimacy."[44] By September 10, 2013, President Obama declared that, "[o]ver the past two years, what began as a series of peaceful protests against the repressive regime of Bashar al-Assad has turned into a brutal civil war."[45] Indeed, in 2012, the United States was covertly "steering arms" to Syrian opposition fighters.[46]

The Syrian rebels had not only raised armies and commenced hostilities but had had military success during the relevant period. On August 5, 2013, the New York Time reported on the rebel invasion of a Syrian Government air base in Minakh, Syria, near Aleppo. "Rebel fighters . .

---

[40] *Id.*

[41] Landler, *supra* note 33.

[42] Hamza Hendawi, *President Assad Acknowledges Struggle to Win Syria Civil War*, INDEPENDENT (Aug. 29, 2012), https://goo.gl/OlAJFj.

[43] White House Press Release, Remarks by the President to the White House Press Corps (Aug. 20, 2012), https://goo.gl/GqS5ON.

[44] *Id.*

[45] Syria Address on Chemical Weapons, *supra* note 31.

[46] Eric Schmitt, *C.I.A. Said to Aid in Steering Arms to Syrian Opposition*, N.Y. TIMES (June 21, 2012), https://goo.gl/hdlvpr.

. swept into a sprawling Government air base in northern Syria where isolated Government troops had fought off their attacks for nearly a year, and by early Tuesday controlled almost all the base, seizing several tanks and other munitions and taking soldiers prisoner, rebel and opposition groups said."[47] Around the same time, in another part of Syria, "a large rebel force armed with tanks and rocket launchers pushed deeper into an area that has long been a relatively quiet Government stronghold, the coastal mountains of Latakia Province."[48] Therefore, the Syrian conflict meets the Supreme Court's test for a civil war, and this Court is "bound to notice and to know" of the war's existence.

**B.** **The executive branch acknowledged that the hostilities in Syria constituted a civil war during the charged period and that the rebels were engaged in legitimate warfare.**

The executive branch of the United States also acknowledged the existence of the Syrian Civil War during the charged period and that the rebels were engaged in legitimate warfare. President Obama stated in his early 2011 remarks on the Syrian conflict, "The Syrian people have called for the freedoms that all individuals around the world should enjoy:  freedom of expression, association, peaceful assembly, and the ability to freely choose their leaders. President Assad and the Syrian authorities have repeatedly rejected their calls and chosen the path of repression."[49] After Assad used chemical weapons on his own people—crossing a "red line" in violation of international law—President Obama accused the Assad regime of "a violation of the laws of war."[50]

---

[47] Anne Barnard & Hwaida Saad, *Rebels Gain Control of Government Air Base in Syria*, N.Y. TIMES (Aug. 5, 2013), https://goo.gl/Zcerx5.

[48] *Id.*

[49] White House Press Release, Statement by the President on Syria (April 22, 2011), https://goo.gl/zGsoMY.

[50] *See* Syria Address on Chemical Weapons, *supra* note 31.

At that time, the president stated that, "[o]ver the past two years," the Syrian conflict "has turned into a brutal civil war."[51]

Finally, on December 11, 2012, President Obama recognized SOC as "the legitimate representative of the Syrian people."[52] The following day, Deputy Secretary of State, William J. Burns, confirmed that "[w]e have now recognized the Syrian Opposition Council as the legitimate representative of the Syrian people."[53] Thus, the executive branch has also acknowledged that the Syrian conflict constituted a civil war during the charged period and that the rebels were engaged in legitimate warfare.

C.      **The United States supported the Syrian rebels, implicitly acknowledging that they were engaged in legitimate warfare.**

The United States implicitly acknowledged that legitimate acts of warfare against the Assad regime do not constitute murder, because it supported Syrian rebels fighting Assad's forces. The United States' support of the opposition is evidence that the United States believes that the opposition generally conducted itself in accordance with the law of war and was entitled to combatant immunity for its acts of legitimate warfare.

On July 23, 2012, the Office of Foreign Assets Control (OFAC) granted a United States nonprofit organization, the Syrian Support Group, Inc. (SSG), a license to support the FSA.[54] Specifically, the license authorized the SSG to "export, re-export, sell, or supply to the Free Syria

---

[51] *Id.*

[52] *See* Landler, *supra* note 41.

[53] U.S. Dept. of State Press Release, Remarks to the Friends of the Syrian People (Dec. 12, 2012), https://goo.gl/QmjOc2 (archived Apr. 13, 2015).

[54] SSG License, *supra* note 17.

Army financial, communications, logistical, and other services."[55] The FSA was formed for the express purpose of fighting against the Assad Government.[56]

In a Frequently Asked Questions (FAQ) sheet released by the SSG, the organization explained that it would only support certain armed groups but would "not seek to impose any other conditions on the use of the funds."[57] The formation of the SSG "cleared the way for U.S. residents to buy weapons for the rebels who are fighting to topple Syrian President Bashar Assad."[58] While the SSG made clear that it did not provide resources to terrorist organizations, the FAQ described the FSA as "a national coalition of affiliated armed rebel groups operating in Syria."[59] It further explained: "The FSA functions more as an umbrella organization than a traditional military command. The FSA is principally organized around provincial military councils, which bring together previously independent militias and brigades."[60] Indeed, on July 22, 2012—the day before OFAC approved its license—the SSG proclaimed on its website, "We consider every Syrian freedom fighter [to be] an FSA member regardless of his/her military or civilian background."[61] It also stated that the organization "work[s] closely with FSA personals [sic] on the ground including generals and civilian armed groups to help in organizing their structures and coordinating among each other."[62] Finally, the SSG made clear that, because it was "a U.S. nonprofit organization, both

---

[55] *Id.*

[56] Joshua Landis, *Free Syrian Army Founded by Seven Officers to Fight the Syrian Army*, SYRIA COMMENT (July 29, 2011), https://goo.gl/soGTs8.

[57] SYRIAN SUPPORT GROUP, *Frequently Asked Questions* ("SSG FAQ"), https://goo.gl/Uvub6m (archived Aug. 27, 2013).

[58] Hannah Allam, *U.S. Eases Arms Purchases for Syrian Rebels*, MCCLATCHY DC (Aug. 1, 2012), https://goo.gl/imkLSA.

[59] SSG FAQ, *supra* note 57.

[60] *Id.*

[61] SYRIAN SUPPORT GROUP, *Home Page*, https://goo.gl/cnuWMs (archived July 22, 2012).

[62] *Id.*

U.S. and non-U.S. individuals and entities (whether corporations or other NGO's) can make charitable contributions to the SSG in support of the FSA."[63]

Not only did the United States Government authorize the SSG to support the FSA, but the government itself, as early as June 21, 2012, was supporting the Syrian rebels directly.[64]  The New York Times explained that "[a] small number of C.I.A. officers [were] operating secretly in southern Turkey, helping allies decide which Syrian opposition fighters across the border will receive arms to fight the Syrian Government."[65] In August 2012, Reuters reported that President Obama had signed an "order authorizing U.S. support for rebels seeking to depose Syrian President Bashar al-Assad and his Government."[66] Finally, in June 2013, President Obama publicly "authorized his administration to provide arms to rebels fighting Syrian President Bashar al-Assad."[67]

During the time the United States and the SSG were supporting the FSA, the FSA was fighting "in support of" some of the designated FTOs listed in the Indictment, because the FSA and the FTOs were fighting together in key battles toward the same strategic goal. Most significantly, the FSA and JMA fought alongside ISIL in the battle for Minakh Air Base on August 5, 2013. The New York Times reported: "The base was first besieged by a Free Syrian Army brigade called North Storm, and joined by fighters from the Islamic State of Iraq and al-Sham and a group calling itself Jaish al-Muhajireen wal Ansar."[68] The Times explained, "The dividing lines between

---

[63] *See* SSG FAQ, *supra* note 57.

[64] *See* Schmitt, *supra* note 46; C.J. Chivers & Eric Schmitt, *Arms Airlift to Syria Rebels Expands, With Aid from C.I.A.*, N.Y. TIMES (Mar. 24, 2013), https://goo.gl/GmeQVo.

[65] *See* Schmitt, *supra* note 46.

[66] Mark Hosenball, *Obama Authorizes Secret Support for Syrian Rebels*, REUTERS (Aug. 1, 2012, 9:04 PM), https://goo.gl/IHDAzp.

[67] Adam Entous & Julian E. Barnes, *U.S. to Arm Syrian Rebels*, WALL ST. J. (June 14, 2013, 5:29 AM), https://goo.gl/Bh2Yh8.

[68] Anne Barnard & Hwaida Saad, *Rebels Gain Control of Government Air Base in Syria*, N.Y. TIMES (Aug. 5, 2013), https://goo.gl/pZGgG3.

the groups and the alliances between them are blurred and shifting, and while it is too early to say who played the decisive role at Minakh, Islamist battalions and Free Syrian Army fighters seem to have worked together there."[69]

The United States funneled money through the SSG to support Abdel Jabbar al-Okaidi, a colonel in the FSA at the time.[70] In a video recorded around August 5, 2013, immediately after the capture of the Minakh Air Base, Colonel Okaidi stood with leaders of ISIL and JMA and praised them as "heroes."[71]  In November 2013, Colonel Okaidi explained that his "relationship with the brothers in ISIL is good" and that he communicates "almost daily with brothers in ISIL."[72] He also thanked "our brothers [JMA] and others."[73] As late as September 26, 2013, the SSG website stated that the SSG was working with Colonel Okaidi. The SSG continued operating until August 2014.[74] Even after the SSG disbanded, however, the United States continued to "provide arms and equipment directly to rebel leaders and their units on the battlefield" until after the period of the alleged conspiracy.[75]

---

[69] *Id.*

[70] Hannah Allam, *Warnings of Jihadists among Syria's Rebels Came Early, Were Ignored*, MCCLATCHY DC (Aug. 13, 2015), https://goo.gl/GK3ZfG.

[71] *US Key Man in Syria Worked Closely with ISIL and Jabhat al-Nusra* ("*U.S. Key Man*"), YOUTUBE, https://goo.gl/h7Q4sF. Joshua Landis, an expert on the Syrian civil war, has authenticated this video. Joshua Landis (@Joshua_Landis), TWITTER (Aug. 27, 2014, 5:43 AM), https://goo.gl/UoujyV.

[72] *U.S. Key Man*, *supra* note 71, at 0:23.

[73] Anne Barnard & Eric Schmitt, *As Foreign Fighters Flood Syria, Fears of a New Extremist Haven*, N.Y. TIMES (Aug. 8, 2013), https://goo.gl/ZyBwi8.

[74] Hannah Allam, *Demise of Group Backing Moderate Syria Rebels is a Warning for U.S.*, MCCLATCHY DC (Sept. 24, 2014), https://goo.gl/k7DmKm.

[75] Phil Stewart & Kate Holton, *U.S. Pulls Plug on Syria Rebel Training Effort; Will Focus on Weapons Supply*, Reuters (Oct. 9, 2015), https://goo.gl/q5qes9.

If fighting against the Assad regime—even in the same battle as ISIL—were murder under United States law, then the United States Government, SSG, and all of SSG's donors were violating § 2339A by knowingly providing material support to combat operations against the Assad regime. But while OFAC can grant a license to engage in activities otherwise forbidden by sanctions, OFAC cannot authorize conduct violating § 2339A. *See* 31 C.F.R. § 595.101. While the Government's actions are not on trial, the United States' support of the rebels is evidence that the Government—and its contacts on the ground—believed the belligerency against Assad was legitimate warfare and that fighters against Assad were entitled to combatant immunity for their legitimate acts of warfare against the regime.

### D.    Pazara and the Bosnian unit's belligerency against Assad falls within the legitimate warfare recognized by the United States.

Pazara in particular and the Bosnian unit he was fought with fell within the broad group of Syrian rebels who were engaged in legitimate warfare against the Assad regime. Because of this, Pazara is entitled to combatant immunity for his legitimate acts of warfare, and Defendants cannot be charged for supporting those acts under § 2339A.

When President Obama announced the United States' support for the Syrian rebels on December 11, 2012, he used broad language, praising the opposition for its representativeness. Specifically, he stated, "At this point we have a well-organized-enough coalition—opposition coalition that is representative—that we can recognize them as the legitimate representative of the Syrian people."[76] President Obama made these statements in response to the creation of the SOC. The SOC is not a closed group. Rather, membership in the SOC was "left open to all hues of the Syrian

---

[76] *See* Landler, *supra* note 33.

opposition."[77] The FSA is a military component of the SOC. As explained on the SOC's website, the SOC "works to prevent the destruction of Syria through the Free Syrian Army."[78] The Syrian opposition recognized by the United States government was, thus, comprised of a broad range of fighters.

Pazara fell under this broad umbrella. When Pazara first arrived in Syria, he simply wanted to fight the brutal Assad regime—"the butcher of Damascus"—and protect the oppressed Syrian people. To that end, he initially joined the FSA. Although the Bosnian unit Pazara belonged to later became associated with JMA, the Bosnians continued "to feel they were aligned with or fighting for the Free Syrian Army." Moreover, JMA fought alongside the FSA in the battle for Minakh Airbase.[79] Because Pazara fought with the FSA and JMA, he fell within the group that the United State recognized as engaged in legitimate acts of war against the Assad regime. This group was engaged in acts of legitimate warfare against the Assad regime, and Defendants cannot be convicted under § 2339A for supporting Pazara's legitimate acts of warfare as part of this group.

## III.   Earlier law of war decisions are distinguishable, because belligerent acts against the Assad regime are legitimate warfare.

Acts of legitimate warfare against the Assad regime do not constitute murder abroad, and those acts may not serve as a basis for either conspiracy or material support charges. The Government will likely rely on cases in which courts analyzed whether individual fighters were entitled to combatant immunity. But those cases are distinguishable. In those cases, there was serious doubt as to whether the defendants' actions were legitimate warfare or mere terrorism. Here, there is no doubt that the United States recognizes the fight against Assad as legitimate warfare.

---

[77] *Doha Agreement*, *supra* note 24.
[78] *SOC Fact Sheet*, *supra* note 25.
[79] Barnard & Sadd, *supra* note 47.

In *United States v. Lindh*, 212 F. Supp. 2d 541 (E.D. Va. 2002), the defense argued that John Walker Lindh, a Taliban soldier, was a lawful combatant and was, therefore, "entitled to the affirmative defense of lawful combatant immunity." *Id.* at 554. The *Lindh* court recognized as "[t]he starting point in the analysis," though, that President George W. Bush had "unequivocally determined that Lindh, as a member of the Taliban, [was] an unlawful combatant." *Id.* To wit, "[i]n February 7, 2002, the White House announced the President's decision, as Commander-in-Chief, that the Taliban militia were unlawful combatants pursuant to GPW and general principles of international law, and, therefore, they were not entitled to POW status under the Geneva Conventions." *Id.* In other words, President Bush declared that the Taliban was not engaged in legitimate warfare at all but was instead engaged in mere terrorism. Because there was serious doubt as to whether the Taliban was engaged in legitimate warfare at all, the court applied a test derived from the Geneva Conventions to determine whether the defendant was entitled to combatant immunity. *See* Geneva Convention Relative to the Treatment of Prisoners of War art. 5, Aug. 12, 1949, 6 U.S.T. 3316, 75 U.N.T.S. 135 ("Should any doubt arise as to whether persons having committed a belligerent act and having fallen into the hands of the enemy belong to any of the categories enumerated in Article 4, such persons shall enjoy the protection of the present Convention until such time as their status has been determined by a competent tribunal.").

Similarly, in *United States v. Hamaza Naj Ahmed, et al.*, Crim. No. 15-49 (MJD) (DN 368), the defendants were charged in the context of terrorism—not legitimate warfare recognized by the United States. In *Ahmed*, the court wrote that, even if it were true that "ISIL has become more than a terrorist organization, the fact remains that ISIL is a designated a [sic] foreign terrorist organization and defendants are charged in the Indictment with conspiring with ISIL to commit murder **in the context of terrorist activities**." *Id.* at \*8 (emphasis added). The important point was that the

defendant in that case was specifically supporting ISIS's *terrorist activities*. Another case, *United States v. Al-Hussayen*, Case No. CR03-048-C-EJL, involved "guerilla fighters," not fighters engaged in legitimate warfare, recognized by the United States. *Id.* at *3.

Unlike *Lindh*, *Ahmed*, and *Al-Hussayen*, the question here is not whether the Court will designate someone a lawful combatant in an unrecognized conflict—much less, a conflict recognized as illegitimate. On the contrary, the question here is whether this Court should—in the face of President Obama's recognition of the Syrian opposition, the United States' support of the FSA and other rebels, and the United States' clear policy against the Assad regime—label Pazara a "murderer" for his acts of legitimate warfare against the Assad regime. As described *supra*, President Obama determined that a broad coalition of Syrian rebels was in engaged in legitimate warfare against Bashar al-Assad. Defendants cannot be prosecuted for supporting these acts of legitimate warfare under § 2339A.

### IV. Even if doubt exists as to the legitimacy of Pazara's alleged belligerent activities, he can satisfy the combatant immunity test.

Because acts of warfare against Assad are recognized as legitimate by the United States, Defendants cannot be prosecuted under § 2339A for supporting Pazara's acts of legitimate warfare against the Assad regime. The defense anticipates that the Government will argue that, even if combat against Assad is legitimate warfare, Pazara as an individual was not a lawful combatant because he was allegedly fighting "in support of" certain designated FTOs and was not following the law of war. This argument is misplaced because § 2339A does not proscribe supporting someone fighting in legitimate warfare even if he is fighting "in support of" designated FTOs, as long as he is engaged only in legitimate warfare. Pazara was fighting with—at times, "as part of" and, at times, "alongside"—the U.S.-backed FSA. At all times, he directed his combatant activities

against the Assad regime just like the forces supported by the United States. As explained *supra*, the United States has recognized belligerent acts against the Assad regime as legitimate warfare.

However, to the extent this Court finds that there is any doubt that Pazara as an individual was engaged in legitimate warfare at the time of the alleged conspiracy, the defense can show, by a preponderance of the evidence, that Pazara satisfied the combatant immunity test described in the *Lindh* decision. In *Lindh*, the defendant was charged with various terrorism offenses. *Lindh*, 212 F. Supp. 2d 545. According to the indictment, Lindh attended a military training camp in Pakistan run by an Islamist militant group. *Id.* After his training, he sought to join the Taliban in Afghanistan. *Id.* He told the Taliban that "he wanted to go to the front lines to fight." *Id.* When he was charged, Lindh argued that, since the Taliban was at war with the United States, he was entitled to "combatant immunity" under the Geneva Convention. *Id.* at 553. The court agreed that this was a potential affirmative defense under the law of war, but ultimately rejected Lindh's argument, because the court found that the Taliban was not a lawful combatant group. *Id.*

As discussed above, the President of the United States recognized that the Syrian rebels were engaged in legitimate warfare against the Assad regime. The "President's determination" was the overriding factor for the *Lindh* court. *Id.* at 556-57. The defense's investigation, however, has revealed that Pazara was a lawful combatant under the other *Lindh* factors as well. Defendant requests a full evidentiary hearing on these issues.

Beyond the executive branch's determination, the *Lindh* court considered four criteria for determining lawful combatant status:

> (1) The organization must be commanded by a person responsible for his subordinates;
>
> (2) The organization's members must have a fixed distinctive emblem or uniform recognizable at a distance;

(3) The organization's members must carry arms openly; and

(4) The organization's members must conduct their operations in accordance with the laws and customs of war.

*Lindh*, 212 F. Supp. 2d at 556 (citing Geneva Convention Relative to the Treatment of Prisoners of War, Aug. 12, 1949, 6 U.S.T. 3316, 75 U.N.T.S. 135, art. 4(A)(2)). Pazara, at the time of the alleged conspiracy, met all these criteria.

Pazara satisfied the first criterion. The Bosnian unit Pazara fought with had "a clear hierarchy with commanders identified by insignia, rank, and special duties ranking from artillery to paramedics to platoon sized fighting units." Exhibit 1 at 5. JMA, as described by Joanna Paraszczuk—an analyst who is an expert on the activities of JMA—was "under the command of a man named Umar Shishani."[80] Jasaveric and Pazara themselves were under the command of Salahuddin al-Shishani, a more moderate leader, who, unlike Umar Shishani, refused to swear *bayat* to ISIS. Exhibit 1 at 4. Paraszczuk further notes that "JMA is made up of units with fighters from the 'Causasus Emirate' [Chechnya and the Caucasus region], Ukraine, Crimea, Russia, and Europe as well as Arab and Asian countries."[81] Jasaveric and Pazara were in the Bosnian unit. Exhibit 1 at 3-4

Pazara also satisfies the second two criteria. The pictures that the Government produced in discovery clearly show Pazara wearing a uniform and carrying a gun openly. *See*, *e.g.*, Exhibit 3; *see also* Exhibit 2 at 4-6. Professor Williams' boots-on-the-ground research corroborates this. Pazara and Jasaveric were expected to obtain uniforms when they arrived and to turn in their uniforms when they left. Exhibit 1 at 4, 8. The group carried arms openly and lived in barracks. Exhibit 1 at

---

[80] Joanna Paraszczuk, *Who Are Jaish Al-Muhajireen Wa Ansar?*, FROM CHECHNYA TO SYRIA (Aug. 15, 2013), https://goo.gl/Pf7YkH.

[81] Joanna Paraszczuk, *Video: Umar Shishani, the Caucasus Emirate & ISIS*, FROM CHECHNYA TO SYRIA (Sept. 11, 2013), https://goo.gl/taJmtr.

7. The Bosnian unit Pazara fought with despised suicide bombings and did not participate in them. Exhibit 1 at 7. There is no need to spend a great deal of time on these criteria, because even the discovery provided by the Government shows that Pazara satisfied them.

Finally, while the Government alleges lack of compliance with the laws and customs of war, Pazara would still be entitled to combatant immunity for his acts of legitimate warfare. As Ms. Paraszczuk has written, "There are no recorded incidences of JMA kidnapping foreigners or attacking civilian communities. JMA has concentrated on fighting the Assad government in Aleppo, mostly north-western Aleppo."[82] And while JMA, at times, fought in the same battle as ISIL against the Assad regime, so did the U.S.-backed FSA, which Pazara initially joined.[83] JMA itself fought under the umbrella of the FSA at that time. Exhibit 1 at 4.

More importantly, though, there is evidence that the particular Bosnian unit that Pazara fought with generally followed the law of war. Exhibit 1 at 4-5. The Bosnians were used largely for guard duty and were known to spend much of their time on Facebook or cooking. Exhibit 1 at 4-5. "They were auxiliary fighters and guards at best, and played no role whatsoever in the creation of ISIS infrastructure and network based in distant Raqqa, Syria." Exhibit 1 at 7. They were not

---

[82] Joanna Paraszczuk, *US Designates Jaish Al-Muhajireen Wal-Ansar as a Foreign Terrorist Fighters*, FROM CHECHNYA TO SYRIA (Sept. 25, 2014), https://goo.gl/zc8bLL.

[83] *See* Joanna Paraszczuk, *Foreshadowing the JMA-ISIS Split: "Chechen Militants Want to Break Away from ISIS"*, FROM CHECHNYA TO SYRIA (Sept. 6, 2013), https://goo.gl/FCnrf7 ("The Khattab Brigade, which later formed the [JMA], fought in and around Aleppo with both the Free Syrian Army and ISIS but according to Taştekin avoided swearing any oath to ISIS leaders."); *see also* Joanna Paraszczuk, *Video: Umar Shishani, the Caucasus Emirate & ISIS*, FROM CHECHNYA TO SYRIA (Sept. 11, 2013), https://goo.gl/taJmtr ("Umar [Shishani, the leader of JMA,] has cooperated with ISIS during the battle for Menagh Airbase in Aleppo . . . but so far the [JMA] have not formally sworn allegiance to the faction. Indeed, tensions in the relationship with ISIS have led to divisions and splits in [JMA].").

"involved in the fray." Exhibit 1 at 8. They generally followed the laws of war and did not kill prisoners of war or harm the Syrian civilians they thought they were protecting. Exhibit 1 at 8.[84]

In light of these factors, Pazara was entitled to combatant immunity during the period of the conspiracy. Under the plain language of § 2339A and the United States law of war, Defendants cannot be convicted for supporting Pazara or agreeing to support lawful combat.

### Conclusion

Under United States law, it is not "murder" to kill as an act of legitimate warfare, even in a civil war. Section 2339A, as charged in this case, forbids only providing or conspiring to provide material support for "murder." At the time Defendants allegedly supported Pazara, Pazara was entitled to combatant immunity and participated only in legitimate acts of warfare against a regime the United States also opposed. Defendants move that the Court find, for the reasons above, that hostile acts against the Assad regime constituted lawful combat under United States law and are therefore immune from prosecution under 18 U.S.C. § 2339A, via 18 U.S.C. § 956. Accordingly, Defendants further move that this Court dismiss Counts One and Three against them for failing to state an offense, because the plain language of the Indictment necessarily charges the lawful conduct of combat against the Assad regime.

Dated: July 21, 2017

Respectfully submitted,

*/s/ Charles D. Swift*
Charles D. Swift
Pro Hac Attorney for Defendant Armin Harcevic
TX State Bar No. 24091964
Constitutional Law Center for Muslims in America
833 E Arapaho Rd, Suite 102

---

[84] The Government seems to allege that Pazara once participated in killing prisoners of war. While this single action, if proved, would itself be liable to criminal prosecution, it would not deprive Pazara of combat immunity for his lawful combatant activities against the Assad regime.

Richardson, TX  75081
(972) 914-2507
cswift@clcma.org

*/s/ Catherine McDonald*
Catherine McDonald
Pro Hac Attorney for Defendant Armin Harcevic
TX State Bar No. 24091782
Constitutional Law Center for Muslims in America
833 E Arapaho Rd, Suite 102
Richardson, TX  75081
(972) 914-2507
cmcdonald@clcma.org

*/s/ Diane Dragan*
Diane Dragan, Assistant Fed. Public Defender
Attorney for Defendant Ramiz Hodzic
1010 Market St., Suite 200
Saint Louis, Missouri 63101
Telephone: (314) 241-1255
Facsimile: (314) 421-3177
Diane_Dragan@fd.org

*/s/ Kevin Curran*
Kevin Curran, Assistant Fed. Public Defender
Attorney for Defendant Ramiz Hodzic
1010 Market St., Suite 200
Saint Louis, Missouri 63101
Telephone: (314) 241-1255
Facsimile: (314) 421-3177
Kevin_Curran@fd.org

*/s/ JoAnn Trog*
JoAnn Trog           42725MO
Attorney for Defendant Rosic
121 West Adams Ave.
Saint Louis, Missouri 63122-4022
Telephone:   314-821-1111
Facsimile:    314-821-9798
jtrogmwb@aol.com

*/s/Paul J. D'Agrosa*
Paul J. D'Agrosa (#36966MO)
Attorney for Defendant Sedina Hodzic
7710 Carondelet, Suite 200
Clayton, Mo. 63105

30

(314) 725-8019
(314) 725-8443 Fax
Paul@wolffdagrosa.com

*/s/ Andrea E. Gambino*
Andrea E. Gambino
Law Offices of Andrea E. Gambino
Co-Counsel for Defendant Mediha Salkicevic
53 W. Jackson Blvd., Suite 1332
Chicago, Illinois  60604
(312) 322-0014 or (312) 952-3056
fax:  (312) 341-9696
agambinolaw@gmail.com

*/s/ J. Christian Goeke*
J. Christian Goeke #39462MO
Co-counsel for Defendant Mediha Salkicevic
7711 Bonhomme Avenue
Suite 850
Clayton, MO 63105
(314) 862-5110
(314) 862-5943- Facsimile
chris@jcgoekelaw.com

## CERTIFICATE OF SERVICE

The undersigned certifies that a true and correct copy of Defendants' Joint Motion Dismissal of Counts One and Three was electronically filed  and served on the Court's electronic filing system:

DATED this 21st day of July, 2017.

/s/ Charles D. Swift
Charles D. Swift
Pro Hac Attorney for Armin Harcevic
833 – E. Arapaho Rd., Ste. 102
Richardson, TX  75081
Tel: (972) 914-2507
Fax: (972) 692-7454
cswift@clcma.org